

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 2, 2026**

_____
**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **Legacy Exploration, LLC,** | § | **CASE NO. 25-34915-SGJ-7** |
| | § | |
| **Alleged Debtor.** | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DISMISSAL OF CONTESTED INVOLUNTARY BANKRUPTCY PETITION

### I.      Introduction.

An involuntary Chapter 7 bankruptcy petition was filed against the above-referenced company (the "Alleged Debtor" or "Legacy") on December 8, 2025, by 23 purported creditors. An Amended Involuntary Petition ("Involuntary Petition") was filed on February 10, 2026, identifying as petitioning creditors 22 of the original 23 petitioning creditors and replacing one creditor that had withdrawn as a petitioner with a new creditor. In addition, a twenty-fourth creditor joined in the Involuntary Petition on February 20, 2026, bringing to 24 the total number of petitioning

creditors ("Petitioning Creditors"). The Alleged Debtor contested the Involuntary Petition with the filing of a Motion to Dismiss[1] on December 30, 2025—arguing that most, if not all, of the Petitioning Creditors lacked standing, pursuant to section 303(b)(1) of the Bankruptcy Code, as their claims were subject to a bona fide dispute. Additionally, the Alleged Debtor asserted "bad faith" and improper purpose as independent grounds for dismissal. Section 305 abstention was also urged by the Alleged Debtor. The Alleged Debtor asked that the Petitioning Creditors be required to post a bond pursuant to section 303(e) to indemnify it for any attorneys' fees, costs, and/or damages that the court may later allow under section 303(i).

The court held an initial status conference on the Involuntary Petition on January 6, 2026, and, after being apprised of the posture of the matter, ruled that it would conduct an initial hearing on the Alleged Debtor's request for the posting of a bond ("Bond Hearing"),[2] and then bifurcate the ultimate trial on the Involuntary Petition into two phases. The first phase of the trial would be an evidentiary hearing to determine whether a sufficient number of the Petitioning Creditors had standing to file the Involuntary Petition under section 303(b) or, alternatively, whether "bad faith" or improper purpose might exist and be independent grounds for dismissal (in other words, even if a sufficient number of Petitioning Creditors had technical standing pursuant to section 303(b)(1)). The second phase of the trial would hinge on the result of phase one:  (a) if the court determined in phase one that a sufficient number of the Petitioning Creditors had standing under section 303(b) and "bad faith" and improper purpose did not exist or serve as an independent grounds for dismissal—then a second evidentiary hearing would be set to determine whether the

---

[1] Motion to Dismiss Involuntary Petition and Brief in Support, DE # 13. The Petitioning Creditors filed their response brief ("Response"), DE ## 21, 22, on January 20, 2026, and Legacy filed its reply brief ("Reply"), DE # 36, on February 3, 2026. In addition, Legacy filed a trial brief ("Trial Brief"), DE # 61, on February 23, 2026.

[2] Following this Bond Hearing, which was held on February 2, 2026, the court denied without prejudice the Alleged Debtor's bond request.

Alleged Debtor was generally paying its debts as they became due (see section 303(h));[3] or (b) if the court determined in phase one that an insufficient number of the Petitioning Creditors had standing under section 303(b) or that "bad faith" and improper purpose existed and served as independent grounds for dismissal—then a second evidentiary hearing would be set to determine whether the Alleged Debtor would be entitled to a judgment in its favor (i) against the Petitioning Creditors for costs and/or attorneys' fees under section 303(i)(1) and/or (ii) against any Petitioning Creditor that filed the petition in bad faith, for damages, including punitive damages, under section 303(i)(2).

The court held an evidentiary trial on the first phase ("Trial") on February 24 & 27, 2026. This constitutes the court's findings of fact, conclusions of law and ruling, pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[4] As explained below, the court has determined that the Petitioning Creditors do not meet the standing requirements under section 303(b)(1), so the Motion to Dismiss should be granted.

## II.    **Background Facts.**

1. The Alleged Debtor is an oil and gas company created in the year 2014. Its business model has been to identify with geologists areas to develop oil and gas projects, obtain oil and gas properties to develop, and then raise money to fund the drilling from its numerous investors—

---

[3] The Alleged Debtor's counsel acknowledged, on the record at the February 2, 2026 Bond Hearing, that the Alleged Debtor is not paying its debts as they come due: "This Debtor has not been operating since '22, when the employees took and stole all the Debtor's assets. As a result, I can't stand here to this Court and say, yes, we're paying our debts as they come due. They can't pay their debts." Transcript of February 2, 2026 Bond Hearing, DE # 43, 14:3-7. Thus, by the time the phase one evidentiary hearing was held in late February, it was not disputed that the Alleged Debtor was generally not paying its debts as they came due.

[4] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute—11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtor has its business headquarters in this district.

specifically, individuals that desire to invest in oil and gas projects whom Legacy typically meets at conferences (hereafter, "Joint Venture Partners").

2.   Legacy's CEO is an individual named Andrew Gautreaux ("Gautreaux"). Gautreaux testified extensively at the Trial. Legacy's assets are primarily its oil and gas leases in Jack County, Texas ("Jack County Leases") and Clay County, Texas ("Clay County Leases"). Gautreaux testified that Legacy has acquired 10-12 leases over the years and worked on 20 wells. Legacy usually outsources the drilling. Gautreaux testified that there are usually 20-35 Joint Venture Partners on any particular project and, thus, there are several hundred Joint Venture Partners who have been involved with Legacy. The Joint Venture Partners actually invest in separate Joint Venture entities, not Legacy per se, although Legacy is, itself, a Joint Venture Partner. They are all the equivalent of general partners, with Legacy being the managing partner.[5]

3.   What follows below is a proliferation of prepetition litigation that was described during the Trial. Most of the Petitioning Creditors were involved in at least one of these actions described below—and most of the actions are still pending.

4.   The "Trade Secrets Litigation."  An individual named Derrick May ("May") was the CFO of Legacy from 2019 until March 2021. Another individual named Chance Smith ("Smith") also worked (as either an employee or independent contractor for services) at Legacy until March 2021. In March 2021, both May and Smith simultaneously left Legacy, along with the rest of Legacy's sales team. They left and formed a competing oil and gas company called Optimum Energy Partners, LLC ("Optimum"). Legacy filed a lawsuit in April 2022 against Optimum, May, Smith, and others (collectively, the "Optimum Defendants") in the United States District Court for the Northern District of Texas, Dallas Division, styled *Legacy Exploration, LLC v. Optimum Energy*

---

[5] *See* Legacy's Tr. Exs. 1-8, DE # 46-1 through 46-16, and Pet. Creditor's Tr. Exs. 8-19, DE # 48 (various Confidential Information Memoranda and Joint Venture Agreements).

*Partners, LLC et al.*, Case No. 3:22-cv-794-S (the "Trade Secrets Litigation"). This Trade Secrets Litigation has not yet been adjudicated. In the Trade Secrets Litigation, Legacy has argued that the Optimum Defendants abruptly left Legacy and immediately began calling Legacy's Joint Venture Partners to invest in Optimum's first oil-and-gas project (allegedly stolen from Legacy), thereby allegedly misappropriating Legacy's trade secrets. Legacy takes the position that the former Legacy sales team devised a scheme to take Legacy's entire fully-built, profitable business with them when they resigned from and left Legacy—taking its list of hundreds of high net-worth investors, all of its employees, and its next three oil-and-gas projects. The Optimum Defendants are represented in the Trade Secrets Litigation by Brent Buyse,[6] who is with the law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"). Mr. Buyse and Nelson Mullins also represent 23 of the 24 Petitioning Creditors in this involuntary petition. Trial was set to begin in the Trade Secrets Litigation in District Judge Karen Scholer's court on April 10, 2024.

5.  <u>The Trager Litigation</u>. On March 20, 2024, just three weeks prior to the anticipated start of a trial in the Trade Secrets Litigation, an entity named Trojan Tubular Services, LLC ("Trojan"), an affiliate of Optimum that happens to be owned in significant part by Smith (remember that both Optimum and Smith are defendants in the above-described Trade Secrets Litigation),[7] purchased an August 6, 2023 Final Default Judgment, that had been entered in a lawsuit pending in the 162nd Judicial District Court of Dallas County, Texas in Civil Action No. DC-23-08138 ("Trager Litigation") against Legacy and Gautreaux. Trojan happens to be one of the 24 Petitioning Creditors in this involuntary bankruptcy case. Trojan was represented by Mr. Buyse and Nelson

---

[6] Mr. Buyse was apparently with the law firm of Gordon Rees Scully Mansukhani, LLP ("Gordon Rees"), which represented the Optimum Defendants at the start of the Trade Secrets Litigation, but he continued to represent the Optimum Defendants, along with Gordon Rees, after he moved to Nelson Mullins and Nelson Mullins was brought in as additional counsel.

[7] Smith testified at Trial that he was a 31% owner of Trojan and was the Chief Operating Officer and has between a 19%-27% ownership interest in Optimum.

Mullins in connection with the purchase of the Final Default Judgment (the same lawyers representing the Optimum Defendants in the Trade Secrets Litigation). The Final Default Judgment in the Trager Litigation had been entered in favor of Tim Trager, Alba Trager, and the Trager Trust (collectively, "Trager") in the amount of $1,007,000 in actual damages, plus attorney's fees, costs, and post-judgment interest (the "Trager Judgment").[8] Trojan paid $500,000 for the assignment of the Trager Judgment,[9] and this amount was funded by Optimum via a loan to Trojan.[10]

6.  Gautreaux credibly testified at the Trial on the Involuntary Petition that, prior to Trojan's purchase of the Trager Judgment and, indeed, prior to the entry of the Trager Judgment itself, Legacy had entered into an oral agreement with Trager ("Oral Forbearance Agreement") whereby Legacy agreed to allow Trager to obtain the Trager Judgment, by default, only if Trager agreed not to commence collection activities, including not seeking a turnover order.[11] But subsequent to this alleged agreement, Trager filed in the Trager Litigation a Motion for Turnover and Appointment of a Receiver ("Turnover Motion") in which Trager sought the turnover ***of Legacy's causes of action being asserted in the Trade Secrets Litigation***, which Legacy alleges constituted a breach of the Oral Forbearance Agreement. The hearing on the Turnover Motion was set for February 28, 2024.

---

[8] Legacy's Tr. Ex. 44, DE # 46-43.

[9] *See* Amended Involuntary Petition, Assignment of Judgment, DE # 41-4; Pet. Creditors' Tr. Ex. 37, DE # 51.

[10] *See* Legacy's Tr. Ex. 52, DE # 46-51, Petitioning Creditors' Response to Interrogatories, 9 (In response to Interrogatory No. 10, which was about how Trojan Tubular funded the acquisition of the Trager Judgment, Trojan Tubular stated that "Optimum provided $500,000 in immediately available funds in the form of a loan to purchase the judgment."); Tr. Transcript, Testimony of Chance Smith on Cross, DE # 71, 168:20-169:15 ("Q: So Optimum provided $500,000 to Trojan to buy this judgment, correct? A: In the form of a loan, yes, sir.").

[11] *See* Tr. Transcript dated February 24, 2026, at 41:18-42:11, DE # 71.

7.   As an aside, Legacy and Trojan (as successor to the Trager Judgment and a Petitioning Creditor herein) happen to disagree as to whether an enforceable oral forbearance agreement ever existed.[12] While both Legacy and Trojan agree upon the existence and enforceability of two written Texas Rule 11 agreements[13] ("Rule 11 Agreements") between Legacy and Trager, set forth in letters dated February 26, 2024,[14] the parties disagree on whether these agreements can be enforced *as forbearance agreements* as opposed to being merely agreements to agree in writing in the future regarding Trager's forbearance with respect to the Trager Judgment.[15] In the first Rule 11 Agreement, the parties simply agreed to a continuance of the February 28, 2024 hearing date set on Trager's Turnover Motion to April 5, 2024, and, in the second Rule 11 Agreement, the parties agreed that "the parties will in good faith attempt negotiate [sic] the terms of a written agreement" that would include a forbearance agreement whereby (a) Trager would forbear from exercising its rights and remedies under the Trager Judgment, including any relief sought in a pending Motion for Turnover Order and Appointment of a Receiver filed by Trager, pending final resolution of the Trade Secrets Litigation, and (b) the Trager Judgment would be satisfied from any proceeds received by Legacy from the Optimum Defendants. Legacy argues that the Rule 11 Agreements constituted enforceable forbearance agreements, but Trojan disagrees, arguing that the Rule 11 Agreements were, at most, agreements by Trager to agree to a forbearance agreement in the

---

[12] While Legacy offered the testimony of Mr. Gautreaux at Trial regarding the Oral Forbearance Agreement upon which Legacy's agreement with Trager to allow the entry of the default judgment, Trojan did not offer any evidence to contradict Mr. Gautreaux's testimony on this issue.

[13] The Texas Rules of Civil Procedure set forth the requirements for enforceability of an agreement between attorneys or parties "touching any suit pending":  it must be either in writing, signed, and filed in the record, or made in open court and entered on the record. Tex. R. Civ. P. 11.

[14] Legacy's Tr. Ex. 45, DE # 46-44.

[15] In addition to testifying to the existence of the Oral Forbearance Agreement, Mr. Gautreaux also testified that the Rule 11 Agreements "confirm[ed] [his] understanding that [he] had reached with Mr. Trager [i.e., the Oral Forbearance Agreement] prior to entry in which [he]—Legacy allowed a default judgment to be entered." Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 43:17-45:12.

future—something that never happened. The existence of these Rule 11 Agreements was disclosed to Trojan prior to its purchase of the Trager Judgment as well as Trager's understanding that neither of the Rule 11 Agreements constituted a forbearance agreement.[16]

8. In any event, Trojan, as the new holder of the Trager Judgment, filed a Supplemental Amended Motion for Turnover Order ("Amended Turnover Motion") in the Trager Litigation on March 28, 2024, seeking turnover of the causes of action being asserted against its affiliate, Optimum, and against Smith (an owner of Trojan), as well as others, in the Trade Secrets Litigation.[17] The Amended Turnover Motion was denied by the state court judge in the Trager Litigation.[18]

9. Interestingly, Smith testified at Trial that Trojan had merely purchased the Trager Judgment for $500,000 to give Trojan leverage in collecting on a $41,427.44 trade debt that Legacy owed to it (more on this trade debt later). And, as earlier noted, Optimum loaned Trojan the $500,000 to purchase the Trager Judgment. The court did not find Smith's testimony credible on this point.

10. The "Tortious Inference Litigation." Naturally, the whole chain of events surrounding Trojan's purchase of the Trager Judgment did not sit well with Legacy. Legacy and Gautreaux viewed it as a bad faith litigation tactic to highjack their pending Trade Secrets Litigation. Thus,

---

[16] In a Jan. 29, 2025 Declaration of Timothy J. Trager, Esq., which was filed in yet another lawsuit—a tortious interference lawsuit filed by Legacy in the 162nd Judicial District, Dallas County, No. DC-24-05229 (more on that lawsuit below)—Mr. Trager stated that he saw the Rule 11 Agreements not as a forbearance agreement but as merely an agreement to discuss the terms of a potential forbearance agreement with Legacy, that "[t]here was never a mutual understanding or meeting of the minds of terms to a potential forbearance agreement," and that he communicated as much to Mr. Smith via email on March 18, 2024 prior to the sale of the judgment to Trojan. Pet. Creditors' Tr. Ex. 40, DE # 51-12.

[17] *See* Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment A.

[18] *See* Order Denying the Trager Plaintiffs' Motion for Turnover Order and Trojan Tubular's Supplemental Amended Motion for Turnover (dated June 3, 2024), Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment H.

in April 2024, Legacy filed suit against Trojan (and the Optimum Defendants) for tortiously interfering with the alleged initial Oral Forbearance Agreement and the Rule 11 Agreements it had entered into with Trager. The new lawsuit was styled *Legacy Exploration, LLC v. Trojan Tubular Services, LLC, et al*., DC-24-05229, in the 162nd District Court of Dallas County, Texas (the "Tortious Interference Litigation").[19] Legacy alleged, specifically, that Trojan obtained the Trager Judgment in a "desperate [attempt] to avoid the upcoming April 2024 trial [in the Trade Secrets Litigation]," and that Optimum and Trojan contacted Trager and "tortiously interfered with those two forbearance agreements" by "wrongfully induc[ing] [Trager] to breach those agreements by inducing him to sell the judgment to Trojan."[20]

11. <u>The Texas Railroad Commission Litigation</u>. There is still more litigation prior to the filing of this Involuntary Petition that is relevant. In the Fall of 2024, Optimum's counsel, Mr. Buyse and the Nelson Mullins firm, joined a Texas Railroad Commission ("TRRC") proceeding that **other parties** were pursuing against Legacy, in an effort to replace Legacy as an operator in favor of a competitor of Legacy named Delfin Operating, LLC ("Delfin") with respect to certain of Legacy's oil and gas leases in Jack County and Clay County.[21] As it turns out, Delfin and its owner, an individual named Ralph Rather, were closely allied with Optimum in the litigation efforts against Legacy during this time, with Delfin having obtained "top" leases on several of Legacy's oil and gas leases with the intent or desire to take over the leases as operator.[22] These TRRC

---

[19] *See* Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment F, Plaintiff's Second Amended Petition, filed December 17, 2024.

[20] Motion to Dismiss, ¶ 46 (citing to Mr. Gautreaux's declaration at Ex. 1 and Attachment F).

[21] *See* Oil and Gas Dockets OG-24-00017479 to 17488, and 17509 in the TRRC.

[22] A "top" lease is a new oil and gas lease executed by a mineral owner while an existing (or "bottom") lease is still active on the same property, becoming effective if and only if the bottom lease is terminated by its terms at lease expiration or prematurely due to lack of production. *See TRO-X, L.P. v. Anadarko Petroleum Corp.*, 548 S.W.3d 458, 462 (Tex. 2018) (cleaned up) ("Basically, a top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease . . . that becomes effective as to those mineral interests subject to a bottom lease only upon termination of the bottom lease."). At that point the holder of the top lease would

proceedings were resolved in Legacy's favor, with the entry of an order by the TRRC denying Delfin's application to be named operator of record in place of Legacy.[23]

12. The "Jack County Lawsuit." There is still more litigation that is relevant. On January 22, 2025, another company of Ralph Rather's called N&R Resources Inc. ("N&R"), and 11 landowners/lessors on the Jack County Leases—which landowners also happen to be Petitioning Creditors (sometimes called the "Jack County Lawsuit Petitioners" herein) represented by Mr. Buyse and Nelson Mullins (again, the same counsel representing the Optimum Defendants in the Trade Secrets Litigation)—commenced a state-court action against Legacy and others in a case styled *N&R Resources, Inc., et al. v. Legacy Exploration, LLC, et al.*, in the 271st Judicial District of Jack County, Texas, Case No. 25-01-009 ("Jack County Lawsuit")[24] for alleged unpaid or underpaid royalties and bonuses due under the Jack County Leases.[25] Just 34 days prior to the commencement of the Jack County Lawsuit, the landowners' counsel (Mr. Buyse) sent Legacy a demand letter dated December 19, 2024, asserting breaches under the Jack County Leases and demanding payment of royalties and bonuses allegedly due under the Jack County Leases and that Legacy "cease any further attempts to access the Mineral Owner's land or operate the wells subject to the Leases" because "the primary term of the Leases has expired and has not been extended into the secondary term by production in paying quantities or other applicable leasehold clauses."[26]

---

gain access to the property and the right to act as the new operator. So, Delfin needed Legacy's bottom lease to be declared terminated so that it could take over as operator under its top leases.

[23] Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment B, Aug. 20, 2025 Ruling from the TRRC.

[24] *See* Legacy's Tr. Ex. 24, Plaintiffs' Original Petition, DE #46-23; Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment C, Plaintiffs' First Amend. Pet., filed Jun. 20, 2025, in the Jack County Lawsuit.

[25] The 11 landowners/lessors that constitute the Jack County Lawsuit Petitioners can be broken down into two groups: seven members of the Sparkman group, who were parties to a single Lease (the "Sparkman Lease") and four members of the Coody group who were parties to four separate Leases (the "Coody Lease(s)"). *See* Legacy's Tr. Exs. 18-22, DE # 46-17 through -21.

[26] *See* Legacy's Tr. Ex. 23, DE # 46-22.

10

Legacy has contested the claims asserted in the Jack County Lawsuit on the basis that they have been paid in full, and Legacy does not owe them anything.[27]

13. <u>The "RICO Lawsuit."</u>  Now, for the sixth relevant prepetition lawsuit. On October 15, 2025, Mr. Buyse and Nelson Mullins (again, same counsel representing the Optimum Defendants in the Trade Secrets Litigation) filed a new lawsuit against Legacy (and others) setting forth claims for RICO violations, securities fraud, common law fraud, and other claims (the "RICO Lawsuit") in a case styled *Philip Allen, et al. vs. Legacy Exploration, LLC, et al*, Case No. 3:25-cv-2806-L, in the federal district court in the Northern District of Texas. Nine of the twelve plaintiffs in the RICO Lawsuit are Petitioning Creditors in this involuntary bankruptcy case and are sometimes referred to herein as the "RICO Lawsuit Petitioners." Messrs. May and Smith (both mentioned earlier in connection with the Trade Secrets Litigation and, Smith whose company Trojan purchased the Trager Judgment Litigation) also happen to be plaintiffs in the RICO Lawsuit. The RICO Lawsuit Petitioners, as a group, are seeking recovery of their "investment funds." Legacy filed a motion to dismiss the RICO Lawsuit on November 10, 2025,[28] in which Legacy argued that the lawsuit should be dismissed under Rule 12(b)(3) because the RICO Lawsuit Petitioners were parties to Joint Venture Agreements ("JVAs"), which contain an arbitration clause that requires arbitration of all disputes under the JVAs with JAMS, with three arbitrators, each of whom must have 10 years of oil and gas experience. Legacy also argued that the RICO Lawsuit should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The RICO Lawsuit Petitioners' response to the Legacy motion to dismiss was due December 12,

---

[27] *See* Motion to Dismiss, Ex. 1, Declaration of Andrew Gautreaux Pursuant to 28 U.S.C. § 1746, Attachment D, Defendants' Second Amended Answer, filed May 7, 2025, in the Jack County Lawsuit.

[28] *See* DE # 17 (Civ. Act. No. 3:25-cv-2806-L).

2025,[29] but the Involuntary Petition was filed on December 8, 2025 by the original 23 Petitioning Creditors, including the RICO Lawsuit Petitioners. Mr. Buyse and Nelson Mullins filed the Involuntary Petition on behalf of the Petitioning Creditors. Mr. Buyse and Nelson Mullins, as counsel to the RICO Lawsuit Petitioniners, filed a suggestion of bankruptcy on December 9, 2025[30] in the RICO Lawsuit and have not filed a response on behalf of the RICO Lawsuit Petitioners to Legacy's motion to dismiss in the RICO lawsuit.

14. Legacy has alleged that the filing of the Involuntary Petition by 23 of the 24 Petitioning Creditors, who were represented by the same counsel (Mr. Buyse and Nelson Mullins) that represents or represented:  (a) the Optimum Defendants in the Trade Secrets Litigation; (b) Trojan in connection with the purchase of the Final Default Judgment (with such acquisition financed by Optimum); (c) Optimum in the TRRC proceedings that were pending against Legacy; (d) plaintiffs in the Jack County Lawsuit (11 of whom are Petitioning Creditors); and (e) plaintiffs in the RICO Lawsuit (nine of whom are Petitioning Creditors), was a bad-faith litigation tactic to stall Legacy's efforts to recover from the Optimum Defendants in the Trade Secrets Litigation that should not be condoned and that the Involuntary Petition should be dismissed based on "bad faith" and "improper motive" alone.

15. As noted earlier, the 23 original Petitioning Creditors morphed into 24 Petitioning Creditors.[31] They fall into four categories based on the nature of their claims:

---

[29] *See* DE # 21 (Civ. Act. No. 3:25-cv-2806-L).

[30] *See* DE # 21 (Civ. Act. No. 3:25-cv-2806-L).

[31] A vendor named MOR Drilling, LLC ("MOR") was an original Petitioning Creditor that subsequently withdrew from the Involuntary Petition. The Petitioning Creditors (minus MOR) filed an Amended Involuntary Petition on February 10, 2026, DE # 41, replacing MOR with another vendor, Duncan Oilfield Construction & Equipment Sales, Inc., bringing the number of Petitioning Creditors back to 23. All of these Petitioning Creditors are represented by Mr. Buyse and Nelson Mullins. Another vendor, Byrd Oilfield Services, LLC ("Byrd"), joined the involuntary petition pursuant to Bankruptcy Code § 303(c) on February 20, 2026, DE # 47, bringing the total number of Petitioning Creditors to 24. Byrd is the only Petitioning Creditor not represented by Nelson Mullins—it is represented herein by Matthew Price of Price Law, PLLC, based in Abilene, TX.

(a) The Holder of a Purchased Judgment (i.e., Trojan, the purchaser of the Trager Judgment).

(b) Four Trade Vendors: Trojan[32]; Quasar Energy Services, Inc. ("Quasar"); Duncan Oilfield Construction & Equipment Sales, Inc. ("Duncan"); and Byrd Oilfield Service, LLC ("Byrd").

(c) 11 Landowners/Lessors in Jack County, Texas (i.e., the Jack County Lawsuit Petitioners), who filed the Jack County Lawsuit: Freda Sparkman Family Trust; Sally Marshall; Nancy Bagoly; Virginia Newton; George Sparkman;[33] Monica Alexander; Betty J Sparkman; Cynthia Johns; Angela Stegall; Warren Coody; and Ruth Coody.

(d) Nine Joint Venture Partners who filed the RICO Lawsuit (RICO Lawsuit Petitioners) in the Northern District of Texas: Phil Allen; Cary Battishill; Aaron Dahl; Michael Dilick; Rodney Eaton; Nam Ko; Karen Kyman; Jay McKinney; and Deryl Peoples.

16. Legacy is admittedly insolvent and unable to pay its bills in the ordinary course and has had no operations or employees since at least the end of 2022.

### III.    Relevant Statutory Authority

17. Bankruptcy Code section 303(b)(1) provides that an involuntary chapter 7 or 11 bankruptcy case may be commenced by the filing with the bankruptcy court of a petition:

> by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $21,050 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.

Section 303(c) permits, after the filing of an involuntary petition, "a creditor holding an unsecured claim that is not contingent" to "join in the petition with the same effect as if such joining creditor were a petitioning creditor . . . ." Thus, to survive Legacy's Motion to Dismiss, the 24 Petitioning Creditors were required to show that at least three of them hold claims against the Alleged Debtor,

---

[32] Trojan has a separate vendor claim in addition to the Trager Judgment it purchased.

[33] George Sparkman died after the filing of the original involuntary petition. A Suggestion of Death regarding this petitioning creditor was filed on January 21, 2026, DE # 24, and this claim is now identified in the Amended Involuntary Petition as being held by the "Estate of George Sparkman."

of an aggregate unsecured amount of at least $21,050, that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount.

18. Notably, the language of section 303(b)(1) was amended by Congress in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").[34] Prior to BAPCPA, the statute did not include the phrase "***as to liability or amount***" after the words "bona fide dispute," and some courts, including the Fifth Circuit, interpreted the pre-BAPCPA language to deny standing to a creditor only when there was a dispute as to ***liability***, such that a dispute merely as to the exact ***amount*** of the claim was not considered a basis for denying standing.[35] By adding the phrase "as to liability or amount" to section 303(b)(1), Congress changed its meaning, and post-BAPCPA cases have recognized that a creditor may be denied standing to bring an involuntary petition if there is a bona fide dispute merely as to the amount of the debt.[36]  Thus, in order to survive the Alleged Debtor's Motion to Dismiss, the Petitioning Creditors here were required to show that at least three of them hold claims against the Alleged Debtor of an aggregate unsecured amount of at least $21,050, which claims are not contingent as to liability or the subject of a bona fide dispute as to either the liability or the amount.

19. The Bankruptcy Code does not define "bona fide dispute," and, as a result, the Fifth Circuit held in *In re Sims*[37] that courts should measure "bona fide dispute" using an objective standard under which the bankruptcy court must "determine whether there is an objective basis for either a

---

[34] Pub. L. No. 109-8, 119 Stat. 23 (2005); *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 656 (5th Cir. 2014).

[35] *Id.* at 656-657.

[36] *Id.* at 657 (citations omitted).

[37] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir. 1993), *cert. denied sub nom. Sims v. Subway Equip. Leasing Corp.*, 510 U.S. 1049 (1994). *Sims* is a pre-BAPCPA case but presumably is still good law on this "objective standard" point.

factual or a legal dispute as to the validity of the debt."[38] The Fifth Circuit adopted the methodology employed by the Eighth Circuit in *In re Rimel* whereby the petitioning creditor must first establish a prima facie case that no bona fide dispute exists with respect to its claim, and then the burden shifts to the alleged debtor to present evidence demonstrating that a bona fide dispute does exist.[39] Because the standard is objective, the alleged debtor's subjective intent or belief is insufficient to meet this burden.[40]  "The court's objective is to decide whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."[41] However, "this does not mean that the court is totally prohibited from addressing the legal merits of the alleged dispute; indeed, the court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists."[42]

20. Moreover, as this court noted in *In re Henry S. Miller*, the fact that a creditor filing an involuntary petition holds an unstayed final judgment "does not create an irrebuttable presumption of no bona fide dispute, just a presumption."[43] The court's reasoning was based on its conclusion that, as a general rule, "an unstayed judgment should not be deemed to be the subject of a 'bona fide dispute' as to liability or amount," but the mere existence of an unstayed judgment "should not ***preclude*** the inquiry into whether a bona fide dispute exists as to the amount or validity of a claim."[44] This court noted that "[i]f there are objective circumstances that might give rise to a bona

---

[38] *Id.* (quoting *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir. 1991) (further citations omitted)).

[39] *Id.* (quoting *In re Rimell*, 946 F.2d at 1365 (citations omitted)); *see also In re Green Hills Dev. Co., L.L.C.*, 741 F.3d at 658 (citing *In re Sims*).

[40] *Id.* (quoting *In re Rimell*, 946 F.2d at 1365 (citations omitted)); *see also In re Green Hills Dev. Co., L.L.C.*, 741 F.3d at 658 (citing *In re Sims*). This court previously noted in *In re Henry S. Miller Commercial, LLC,* 418 B.R. 912, 921 (Bankr. N.D. Tex. 2009) that the "objective standard" in the law has historically meant using the hypothetical "reasonable man" standard.

[41] *Id.* (quoting *In re Rimmel*, 946 F.2d at 1365 (citations omitted)).

[42] *Id.*

[43] *In re Henry S. Miller*, 418 B.R. at 921.

[44] *Id.*

fide dispute as to liability or amount . . . , then having an unstayed judgment may not pass muster under Section 303."[45]  The court gave examples, parenthetically, of situations where the objective circumstances surrounding an unstayed judgment might give rise to a bona fide dispute: "a default judgment where facts were not actually litigated; . . . a judgment inadvertently entered against a non-party; . . . where subsequent events cast doubt upon the judgment's enforceability, such as due to a payment of the judgment debt or posting of a bond, or even some sort of appellate court holding in another case that changes the law and suggests it is inevitable that the unstayed judgment will be reversed."[46] Thus, putting evidence of an unstayed final judgment on the record satisfies a petitioning creditor's initial burden of proof[47] on the lack of a "bona fide dispute" issue, which then shifts the burden of proof to the alleged debtor to rebut the presumption "with evidence showing factual or legal contentions with the judgment" that "call into question the validity, enforceability, or accuracy of [the] judgment."[48]

21. Section 303(h)(1) provides, in pertinent part, that if the involuntary petition is timely controverted, after a trial, "the court shall order relief against the debtor . . . only if . . . the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." Legacy does not dispute that it is not

---

[45] *Id.* at 921-22.

[46] *Id.*at 922. The court clarified that the existence of an appeal of an unstayed judgment would not be enough to create a bona fide dispute, "[b]ut a highly specialized fact pattern can conceivably guide a court to make an exception to the general rule recognizing the finality/enforceability of an unstayed judgment" before going on to conclude that there was no specialized fact pattern "to make an exception to the rule that, where there is an unstayed judgment (even if on appeal) there is no bona fide dispute." *Id; see also In re Marbach Assocs.*, *LLC*, No. 25-50815-mmp, 2025 WL 3772619, at *5 (Bankr. W.D. Tex. Dec. 31, 2025) (citations omitted), where Bankruptcy Judge Parker agreed with this court's conclusion in *In re Henry S. Miller* that there is an exception to the general rule that an unstayed judgment is not subject to bona fide dispute "when subsequent events call into question the validity, enforceability, or accuracy of a judgment."

[47] This court, in *In re eBackpack*, 605 B.R. 126, 134 (Bankr. N.D. Tex. 2019), described this initial burden as being a "low bar."

[48] *Marbach*, 2025 WL 3772619, at *5 (citations omitted).

currently operating, does not have any employees, and is not generally paying its debts as they come due.

22. Section 303(i) provides,

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
>
> (1) against the petitioners and in favor of the debtor for –
>    (A) costs; or
>    (B) a reasonable attorney's fee; or
> (2) against any petitioner that filed the petition in bad faith, for –
>    (A) any damages proximately caused by such filing; or
>    (B) punitive damages.

Legacy argues that the Petitioning Creditors filed the Involuntary Petition in bad faith and that the court should dismiss on this basis alone, even if the court finds that the Petitioning Creditors meet the explicit requirements under section 303(b)(1) and (h)—in other words, that section 303(i) should be interpreted to include bad faith as an ***independent basis for dismissal***.

23. Finally, if the court does not dismiss the involuntary petition under section 303, Legacy urges the court to dismiss it under the abstention provisions of Bankruptcy Code section 305(a)(1), which provide, "(a) The court, after notice and a hearing, may dismiss a case under this title . . . at any time if – (1) the interests of creditors and the debtor would be better served by such dismissal . . . ." "The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under section 305(a)(1) only in the situation where the court finds that both 'creditors and the debtor' would be 'better served by a dismissal.'"[49] "'Granting an abstention motion pursuant to section 305(a)(1) requires more than a simple balancing of harm to the debtor and

---

[49] *In re AMC Investors*, 406 B.R. 478, 488 (Bankr. D. Del. 2009) (citing *In re Eastman*, 188 B.R. 621, 624 (B.A.P. (9th Cir. 1995).

creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief.'"[50] The movant bears the burden to demonstrate that the interests of the debtors and creditors would benefit from dismissal.[51]

### IV.        Standing (or Lack Thereof) of Petitioning Creditors Under Section 303(b)

24. Legacy argues that none of the Petitioning Creditors have standing under Bankruptcy Code section 303(b)(1) and, therefore, the Involuntary Petition must be dismissed. Naturally, the Petitioning Creditors argue the exact opposite: that Legacy has presented no evidence of an objective dispute as to the liability or amount of any of the Petitioning Creditors' claims.

25. Following the Fifth Circuit's approach in *In re Sims*, the court will apply an objective standard to its analysis of each of the 24 Petitioning Creditors' claims to determine whether such claims are the subject of a bona fide dispute as to liability or amount.[52]

26. Trojan. Trojan indicated in the Amended Involuntary Petition that it has a single claim in the amount of $1,334,634.95, in the nature of "Judgment and Business Debt."[53] However, this claim actually has two components. Specifically, the Trial evidence reflected that Trojan has a $41,427.44 vendor/trade claim ("business debt") based on invoices for services rendered to Legacy in the first quarter of 2021 that Legacy allegedly has not paid (the "Unpaid 2021 Invoices").[54] The other component of the Trojan claim is for the $1,007,000 Trager Judgment which (as earlier discussed) Trojan purchased on March 20, 2024.

27. With regard to the Trojan Unpaid 2021 Invoices, Chance Smith, who is a minority owner of and Director of Sales for Trojan (and, as earlier discussed, is one of the Legacy former

---

[50] *Id.*; *see also In re Smith*, 415 B.R. 222, 238-239 (Bankr. N.D. Tex. 2009).

[51] *Id.*

[52] *See supra* notes 37-40 and accompanying text.

[53] Amended Involuntary Petition, 3.

[54] Pet. Creditors' Tr. Ex. 34, DE # 51-6.

employees that is being sued—as an "Optimum Defendant—by Legacy in the Trade Secrets Litigation), testified at Trial that: (a) the alleged unpaid invoices were for services rendered—specifically, the installation of the tubular casing inside oil and gas wells—relating to Legacy's Ragin Cajun ## 2, 3, and 007 wells located in Jack and Clay Counties, Texas; (b) the invoices were prepared in the ordinary course of Trojan's business and issued to Legacy; (c) neither Legacy nor any third party paid the invoices, and they remain unpaid; and (d) the stated claim amount of $41,427.44 does not include any interest or late charges that Trojan claims it is entitled to under Texas law.[55] Legacy argues that this claim relating to the Unpaid 2021 Invoices is subject to a bona fide dispute, and Trojan disagrees.

28. With regard to the $1,007,000 Trager Judgment which (as earlier discussed) Trojan purchased on March 20, 2024,[56] Trojan suggests that, because it is "a valid, final, and nonappealable judgment that has not been vacated, stayed, or reversed," it is not, as a matter of law in the Fifth Circuit, subject to a bona fide dispute as to either liability or amount and that it has "satisfied its burden with respect to its claim under the [Trager Judgment]."[57] Trojan is not entirely correct. As explained above, the law in the Fifth Circuit regarding unstayed and final judgments (and in this court, in particular, under *In re Henry S. Miller*) is that a petitioning creditor meets its initial burden of proof and establishes its prima facie case that its claim is not the subject of a bona fide dispute by putting on evidence that it holds such a judgment. To be sure, Trojan meets its

---

[55] Tr. Transcript, Direct Testimony of Chance Smith, DE # 71, 149:16-154:20.

[56] The court duly notes Bankruptcy Rule 1003(a) which states that an entity that has acquired a claim for the purpose of commencing a[n involuntary] case . . . shall not be a qualified petitioner. The Petitioning Creditors attached a Rule 1003(a) statement by David Bridges, President and Managing Member of Trojan, to the Amended Involuntary Petition in which Mr. Bridges declared under penalty of perjury that the transfer of the Trager Judgment to Trojan "was not made for the purpose of commencing this involuntary bankruptcy case against Legacy." Amended Involuntary Petition, Statement Regarding Transfer of Claim Pursuant to Bankruptcy Rule 1003(a), DE # 41-4. The court gives Trojan the benefit of the doubt that it did not acquire the Trager Judgment for purposes of commencing the Involuntary Petition since it was purchased approximately 21 months before the Petition Date.

[57] Response, 13.

burden here by introducing the Trager Judgment. But, where Trojan gets it wrong, is its suggestion that this is the end of the inquiry. In *In re Henry S. Miller*, this court noted that, while a petitioning creditor does meet its **initial** burden with respect to the bona fide dispute issue when it introduces a final and unstayed judgment, it only does that. It does not create an irrebuttable presumption that the claim is not subject to bona fide dispute; rather, the burden just shifts to the alleged debtor to show that the claim **is** the subject of a bona fide dispute. The court must then determine whether objective circumstances exist that give rise to a bona fide dispute as to liability or amount.[58]

29. Here, Legacy argues that it has introduced evidence that it is and has been challenging the enforceability of the Trager Judgment. First, Legacy points to the Tortious Interference Litigation (filed in April 2024, and still unresolved) wherein Legacy alleges that, in purchasing the Trager Judgment, Trojan tortiously interfered with the agreement Legacy had with Trager to allow entry of the default judgment in exchange for Trager agreeing not to execute on it. Mr. Gautreaux provided credible Trial testimony, to the same effect, regarding his agreement with Trager that led to the entry of the default judgment in favor of Trager and the circumstances surrounding Trager's sale of the Trager Judgment to Trojan on the eve of trial in the Trade Secrets Litigation.[59] Mr. Gautreaux also testified that the two Rule 11 Agreements confirmed his understanding of the agreement he had made with Trager. Legacy argues that, *as an assignee, Trojan took the judgment subject to defenses that Legacy had against its original owner, including Trager's alleged breach of the Oral Forbearance Agreement*. In addition, Legacy offered, as additional evidence that the Trager Judgment is the subject of a bona fide dispute, the Tortious Interference Litigation[60] and argues that "Trojan's own tortious conduct in purchasing the judgment, and then subsequently

---

[58] *See supra* notes 43-48 and accompanying text.

[59] Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 41:14-43:14.

[60] *See supra* notes 19-20 and accompanying text.

weaponizing it to defeat a trial date in the Trade Secrets Litigation, render it subject to equitable defenses that defeat collection."[61] Legacy has introduced evidence sufficient to refute the rebuttable presumption that Trojan's claim, based on the Trager Judgment, is not the subject of a bona fide dispute. The court finds that the objective circumstances here regarding the enforceability of the Trager Judgment (which is the subject of pending litigation—i.e., the Tortious Inference Litigation) give rise to a bona fide dispute as to liability or amount, and, thus, Trojan does not have standing under section 303 to bring the Involuntary Petition with respect to its claim related to the Trager Judgment.

30. But what about the portion of Trojan's claim related to the business debt—i.e., the Unpaid 2021 Invoices? Trojan has argued that its overall $1,334,634.95 "claim" can be bifurcated into separate "claims"—$1,293,207.51 based on the Trager Judgment and $41,427.44 for the Unpaid 2021 Invoices.[62] The court agrees with this argument. To be sure, courts have been split on whether a bona fide dispute as to the *amount* of a creditor's claim—where there is an undisputed portion of the creditor's claim in excess of the statutory threshold—is sufficient to divest that creditor of standing to file an involuntary petition (notwithstanding BAPCPA's language stating that a bona fide dispute as to *either* liability or amount destroys standing).[63] In fact, one court in this district concluded that "a bona fide dispute as to the amount of a creditor's claim does not divest that petitioning creditor of standing to file an involuntary petition if there is an undisputed *portion* of the creditor's claim in excess of the statutory threshold."[64]

---

[61] Motion to Dismiss, ¶ 47.

[62] Trojan did not raise this argument in the Petitioning Creditors' Response, but for the first time at closing arguments. *See* Tr. Transcript, February 27 Closing Arguments, DE # 73, 50:9-17.

[63] *See In re Williams*, 616 B.R. 690, 693 (Bankr. N.D. Tex. 2020).

[64] *Id.* at 694 (emphasis added). Judge Hale noted that "[t]his interpretation strikes the proper balance 'between the ability of petitioning creditors to have access to the bankruptcy courts and the interest of would-be debtors to remain free from involuntary petitions,' and is in line with the legislative history of section 303(b)(1)." *Id.* (quoting *In re Gen. Aeronautics Corp.*, 594 B.R. 442, 465 (Bankr. D. Utah 2018)).

31. Accepting Trojan's argument that bifurcation is a possibility (and, actually, appropriate) here with regard to the Unpaid 2021 Invoices (since this seems like a wholly unrelated claim to the Trager Judgment that Trojan purchased), Trojan has met its ***initial*** burden of showing its claim for amounts allegedly due under these invoices is not the subject of a bona fide dispute as to liability or amount, through pleadings and the introduction of evidence, including the invoices themselves,[65] as well as testimony from Chance Smith that the services set forth in the invoices were rendered at the Ragin Cajun ## 2, 3, and 007 wells and that they remain unpaid by Legacy or any third party.[66] The burden shifts, then, to Legacy to point to objective evidence or circumstances that show that Trojan's claim based on the Unpaid 2021 Invoices is, indeed, subject to bona fide dispute as to liability or amount. Legacy here has met its burden.

32. Specifically, ***Legacy has argued that the Unpaid 2021 Invoices are the subject of a bona fide dispute, at least as to liability, because the four-year statute of limitations has expired on this claim***. The invoices are all dated between January and March 2021. The Involuntary Petition was filed in December 2025, with no collection action ever having been taken by Trojan on the Unpaid 2021 Invoices. Trojan counters that an affirmative defense of statute of limitations is simply a bar to collection that does not extinguish the underlying debt. But, the existence of the underlying debt is not the issue here. The issue is whether there is a bona fide dispute as to the liability or amount of the debt. Trojan's position seems nonsensical in this context. It is undisputed under Texas law that a debtor is entitled to summary judgment in a suit against it for unpaid invoices when the creditor's claim is barred under the statute of limitations,[67] which in Texas, is

---

[65] Pet. Creditors' Tr. Ex. 34.

[66] *See supra* notes 47-48 and accompanying text.

[67] *See, e.g.*, *Levinson Alcoser Assoc., L.P. v. El Pistolon II, Ltd.*, 670 S.W.3d 622, 626 (Tex. 2023).

four years from the time the invoices come due.[68] Courts applying section 303 have repeatedly treated limitations defenses as creating a bona fide dispute, and, in this court's view, rightly so.[69] Because of the age of the invoices (January through March 2021; showing due dates between February and April 2021),[70] there is objective evidence that Trojan's claim against Legacy based on the Unpaid 2021 Invoices is the subject of a statute of limitations defense (i.e., a bona fide dispute for standing purposes). Thus, Trojan's entire claim (consisting of both the claim pertaining to the Trager Judgment and the claim pertaining to the 2021 Unpaid Invoices) should be deemed the subject of a bona fide dispute. Trojan does not have standing under section 303(b)(1).

33. To be sure, Trojan's motives in choosing to be a Petitioning Creditor seem highly suspect. Trojan's 31% owner (Mr. Smith) has been a defendant in a lawsuit with Legacy (the Trade Secrets Litigation) since 2022. Mr. Smith is accused, along with others, of stealing Legacy's business secrets and opportunities. Trojan purchased the Trager Judgment in what appears to have been an effort to shut down (through a turnover motion) Legacy's Trade Secrets Litigation. Because this court has determined that Trojan does not have standing to be a petitioning creditor under the requirements of section 303(b)(1), because of bona fide disputes regarding its claims, this court need not decide whether bad faith and improper motive serve as an independent basis to disqualify Trojan from being a petitioning creditor.

---

[68] *See, e.g.*, *IDA Eng'g, Inc. v. PBK Architects, Inc.*, 2016 WL 5791674 at *2 (Tex. App.—Dallas Oct. 4, 2016, no pet.) (holding that the four-year limitations period began to run when payment was due on an invoice because "a party breaches a contract when it fails to pay an invoice on or before the date payment is due"); *see also Iyer v. Syndigo, LLC*, 2025 WL 2645911, at *3 (S.D. Tex. Sept. 15, 2025) (same).

[69] *See, e.g.*, *Landon v. Hunt*, 977 F.2d 829 (3d Cir. 1992) (holding limitations defense creates a bona fide dispute); *In re Vortex Fishing Systems, Inc.*, 277 F.3d 1057 (9th Cir. 2002) (same); *In re Elverson*, 492 B.R. 831, 839 (Bankr. E.D. Pa. 2013) ("[t]he application of the [statute of limitations] creates a bona fide dispute as to the enforceability" of the claim).

[70] Pet. Creditors' Tr. Ex. 34.

34. <u>The Trade Vendor Claims</u>. Three of the Petitioning Creditors have what the court would call traditional vendor claims:[71]

<u>Quasar</u>. In the Amended Involuntary Petition, Quasar is listed with a claim in the amount of ***$585,495.14*** as "Business Debt,"[72] which is based on fracking services provided to Legacy in 2022, which later resulted in a Lien Affidavit being filed in Clay County, Texas on November 7, 2022 ("2022 Lien Affidavit"). The 2022 Lien Affidavit was signed by Tim Sicking, President of Quasar, and attached an invoice and related documentation for the services rendered to Legacy relating to the re-fracking of Legacy's Ragin Cajun #3H well in Clay County, Texas. Paragraph 5 of the 2022 Lien Affidavit states that the aggregate amount due from Legacy is significantly more than the ***$585,495.14*** amount shown in the Amended Involuntary Petition—specifically, ***$693,117.59***.[73] Interestingly, the invoice (and an accompanying bid) attached to the 2022 Lien Affidavit show that Legacy was offered a ***50% discount (thus, $349,549.34 would be the amount owed)***.[74] But Mr. Sicking testified at Trial that, in the ordinary course of its business, Quasar offered customers a 40-50% discount to incentivize them to pay their invoices within 60 days. If a customer didn't pay within the 60 days, the customer would owe the full undiscounted amount, and he said that the Legacy invoice specifically reflected this 50% incentive discount and contained an express statement that any discounts provided for in the invoices would be void, if not paid

---

[71] This is in addition to the portion of the Trojan claim that is in the nature of a vendor claim (i.e., the Unpaid 2021 Invoices)

[72] Amended Involuntary Petition, 3.

[73] In the Response filed prior to the Amended Involuntary Petition, Quasar represented that it was owed a larger amount than reflected on the Involuntary Petition—$693,117.59—and that it would be filing an Amended Involuntary Petition to state the amount of the claim, but Quasar still indicated in the Amended Involuntary Petition that was filed on February 10, 2026, that its claim amount is $585,495.14. Nevertheless, Quasar's President Mr. Sicking testified at Trial that, as of the date of the Trial, $693,117.59—which was stated in the 2022 Lien Affidavit—was "an accurate reflection" of the outstanding balance that Legacy owes "as of today[,]" except that it excludes interest continuing to accrue. *See* Tr. Transcript, Direct Testimony of Tim Sicking, DE # 71, 200:13-201:2.

[74] Pet. Creditors' Tr. Ex. 35, DE # 51-7.

within 60 days.[75]  But that is actually not consistent with the invoice submitted into evidence. The invoice submitted into evidence simply reflects a 50% discount, and provides that payment terms are net 30 days and that a "finance charge of 1.5% per month or 18% annual percentage rate will be charged on all past due accounts."[76]  In any event, according to Mr. Sicking's testimony, the $693,117.59 shown in the 2022 Lien Affidavit, was "an accurate reflection" of the outstanding balance that Legacy owes "as of today[,]" except that it excludes the interest continuing to accrue.

Assuming this evidence met Quasar's burden of showing it has an unsecured claim not the subject of a bona fide dispute as to liability or amount, such that the burden has shifted to Legacy to refute it, Legacy argues Quasar's claim is subject to a bona fide dispute as to both liability and amount. Legacy argues that, to the extent Quasar actually holds a lien, it is not against Legacy, but, against equipment, which is owned by the Ragin Cajun #3H Joint Venture entity.[77]  In response, counsel for Quasar acknowledged at Trial that, to the extent Quasar might have had lien rights based on the 2022 Lien Affidavit, the lien is not legally enforceable today and is no longer valid.[78]  More to the point it seems, Mr. Gautreaux credibly testified at Trial that, prior to the Involuntary Petition, it had been "years" since he had heard anything from Quasar regarding the unpaid invoice.[79]  However, Legacy did not argue that Quasar's claim was subject to a limitations defense. Rather, Legacy disputes **the amount** of Quasar's invoices based on the work that it did and did not do at the Ragin Cajun #3H well. Mr. Gautreaux testified at Trial that Quasar provided

---

[75] *See* Tr. Transcript, Direct Testimony of Tim Sicking, DE # 71, 191:1-19; 198:13-199:20; 200:13-201:2.

[76] Pet. Creditors' Tr. Ex. 35, DE # 51-7.

[77] Motion to Dismiss, ¶ 42.

[78] *See* Tr. Transcript, Petitioning Creditors' Closing Argument, DE # 73, 60:16-24. Consequently, Quasar's claim is unsecured and does not call into play the language in § 303(b)(1) that requires that the non-contingent claims of the petitioning creditors that are not the subject of a bona fide dispute as to liability or amount to aggregate at least $21,050 "more than the value of any lien on property of the debtor securing such claims held by the holders of such claims."

[79] Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 87:6-10.

25

fracking services to Legacy and that, with respect to this particular frack job at this well, Legacy was not satisfied with the initial frack job, and that Legacy had to call Quasar out to re-frack the same well, and that Legacy still did not believe that either frack job was successful, and that Legacy was forced to incur additional costs in bringing in another company to try to correct the issues that it was experiencing.[80] ***Mr. Gautreaux credibly testified that Legacy should have an offset with respect to the Quasar invoices, at least to the extent that Legacy was required to incur the additional costs to fix the issues allegedly caused by Quasar, which he estimated to be in the range of $200,000 and $350,000,[81] but acknowledged on cross examination that the offset was not sufficient to dispute the entire amount of the Quasar claim.***[82] So, at least a portion of Quasar's claim is undisputed as to amount, which brings up the issue mentioned above in connection with Trojan's claim and the BAPCPA amendments.

Recall that this court earlier mentioned, in connection with evaluating Trojan's "claim" or "claims," that courts have been split on whether a bona fide dispute as to the amount of a creditor's claim—***where there is an undisputed portion of the creditor's claim in excess of the statutory threshold***—is sufficient to divest that creditor of standing to file an involuntary petition (notwithstanding BAPCPA's language stating that a bona fide dispute as to either liability or amount destroys standing).[83]  This court noted that Judge Hale in this district, in *In re Williams*, concluded that "a bona fide dispute as to the amount of a creditor's claim does not divest that petitioning creditor of standing to file an involuntary petition if there is an undisputed ***portion*** of the creditor's claim in excess of the statutory threshold."[84] Quasar is asserting a single claim based

---

[80] Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 84:2-86:22.

[81] Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 86:22-87:5.

[82] Tr. Transcript, Cross Examination Testimony of Andrew Gautreaux, DE # 71, 141:21-25.

[83] *See In re Williams*, 616 B.R. 690, 693 (Bankr. N.D. Tex. 2020).

[84] *Id.* at 694 (emphasis added).

on a single theory of liability (an unpaid 2022 fracking invoice). Is it enough here that Legacy, through Mr. Gautreaux's testimony, admitted that the offsets Legacy had to Quasar's claim likely did not offset the full amount Quasar claims as owing?  The court thinks not. If Quasar has met its initial burden here to show an undisputed claim, so as to shift the burden to Legacy to show bona fide disputes, Legacy has met its burden to show bona fide disputes as to amounts. This scenario seems to fit squarely into what Congress intended with the 2005 amendments to section 303(b). If a claim is subject to dispute as to liability *or amount*, standing of that claimant is destroyed. To be sure, some amount is likely owed by Legacy to Quasar, but there are multiple vagaries regarding the amount. First, the exact amount of offsets is undetermined. Second, the potential to lose the 50% discount on the Quasar invoice is not described on the invoice in the way Mr. Sicking described in testimony. Third, the amount shown as owed to Quasar on the Involuntary Petition (*$585,495.14*) differs by more than $100,000 from Mr. Sicking's testimony and the amount shown on the 2022 Lien Affidavit (*$693,117.59)*. Mr. Sicking testified that he had filed his 2022 Lien Affidavit because he thinks liens are the only way to get paid from an operator, but he has no idea of the value of the Quasar lien or if he could foreclose at this point. Finally, the court notes that when asked why Quasar joined in the Involuntary Petition, Mr. Sicking testified it was because Ralph Rather asked him to do so. Recall that Ralph Rather is the individual that owns a company called Delfin which obtained "top" leases on several of Legacy's oil and gas leases with the intent or desire to take over the leases as operator. Mr. Sicking testified that Delfin has been a partner of Quasar's that "actually pays their bills."  He said it would give him "personal satisfaction" to get someone in on the Legacy leases who will pay their bills. "What do I have to lose?" Mr. Sicking testified.[85]

---

[85] Tr. Transcript, Direct Testimony of Tim Sicking, DE # 71, 203:3-6.

27

Quasar, four years after performing re-fracking services for Legacy, seems to have motives with regard to its unpaid 2022 re-fracking services, other than simply getting its outstanding amounts finally paid. In any event, because this court has determined that Quasar does not have standing to be a petitioning creditor under the requirements of section 303(b)(1), because of bona fide disputes regarding the amount of its claim, this court need not decide whether bad faith and improper motive serve as an independent basis to disqualify Quasar from being a petitioning creditor.

Duncan. Duncan is an oilfield construction and equipment sales company and is a vendor that joined in later in the Amended Involuntary Petition. It asserts a claim in the amount of $63,427.08.[86] Duncan's claim is supported by invoices for services rendered to Legacy's Ragin Cajun ##2H and 3H wells in November and December 2020,[87] and, thus, would appear to meet its initial burden here. However, these are (once again) relatively old invoices—more than five years old as of the time of the filing of the Involuntary Petition. Legacy has argued, convincingly, that there is a bona fide dispute as to the collectability of Duncan's claim based on the same four-year statute of limitations defense that the court earlier found creates a bona fide dispute as to Trojan's claim pertaining to its Unpaid 2021 Invoices. Thus, the court finds that Duncan does not have standing to be a petitioning creditor under the requirements of section 303(b)(1), because of a bona fide dispute regarding liability on its claim.

Byrd. Byrd is an oilfield services company that filed a joinder in the Involuntary Petition on February 20, 2026, claiming to hold "an undisputed, noncontingent and liquidated claim against [Legacy] in an amount not less than $26,469.27, excluding interest," arising from an alleged

---

[86] Amended Involuntary Petition, 3.
[87] Pet. Creditors' Tr. Ex. 36, DE # 46-8.

unpaid February 2023 Settlement Agreement that arose from a 2022 state court lawsuit brought by Byrd against Legacy in Jack County, Texas.[88] Byrd is the only Petitioning Creditor out of the 24 that is not represented by Mr. Buyse and Nelson Mullins. Legacy argues that there is a bona fide dispute as to Byrd's claim based on full payment. Byrd did not participate in the February 24 evidentiary portion of Trial and, thus, offered no evidence on the bona fide dispute issue.[89] Gautreaux credibly testified at Trial that he had a vivid recollection of (a) a Byrd representative showing up at the Legacy offices to demand payment, (b) Gautreaux then going to the back of the offices to talk with his bookkeeper, who confirmed that Byrd had just been paid and produced a copy of the wire transcript evidencing payment, (c) relaying that information to the Byrd representative and showing her the wire transcript, (d) and the Byrd representative getting on the phone with Byrd's home office, which confirmed that Legacy had paid and did not owe them any money and, finally, that he had not heard from Byrd since that office visit had occurred several years ago.[90] The court finds that Byrd's claim is subject to a bona fide dispute and, thus, Byrd does not have standing under section 303(b)(1).

35. <u>Jack County Lawsuit Petitioners (Landowners/Lessors)</u>. As noted earlier, 11 of the 24 Petitioning Creditors are lessors who are plaintiffs in the Jack County Lawsuit. Seven of these 11 Jack County Lawsuit Petitioners have asserted claims for unpaid royalties in the amount of $25,543.61 each. These seven are sometimes referred to as the Sparkman Group.[91]  Four of these 11 Jack County Lawsuit Petitioners, which are sometimes called the "Coody Group," have asserted

---

[88] *See* Joinder of Byrd Oilfield Services, LLC as Petitioning Creditor in Involuntary Chapter 7 Bankruptcy Proceeding of Legacy Exploration, LLC ("Joinder"), DE #47.

[89] Byrd's Joinder is a bare-bones, single-page Joinder, attaching a copy of its Involuntary Petition, which does not include any documentation or evidentiary support for its claim against Legacy. Byrd did appear, through counsel and after the close of evidence, at the February 27 closing arguments.

[90] Tr. Transcript, Direct Testimony of Andrew Gautreaux, DE # 71, 96:14-97:7.

[91] Freda Sparkman Family Trust; Sally Marshall; Nancy Bagoly; Virginia Newton; Estate of George Sparkman; Monica Alexander; and Betty J Sparkman (the "Sparkman Group").

claims in the Jack County Lawsuit for unpaid royalties in the amounts of $1,600.47 (Cynthia Johns), $1,600.47 (Angela Stegall), $49,664.56 (Warren Coody), and $3,301.95 (Ruth Coody), respectively.

36. Legacy has disputed these claims, both in the Jack County Lawsuit and in this court, on the basis that these landowners/lessors have been paid all amounts due under their respective leases.[92] Legacy argues that they are estopped from claiming unpaid royalties, which claims are based on "shaving" allegations, because they each signed division orders[93] setting forth each landowner's specific royalty interest percentage, which, under Texas law, are binding on the payee until revoked. In addition, Legacy argues that their claims are not only the subject of a bona fide dispute *but are also contingent*, and, therefore, they do not have standing under section 303(b).

37. While the Petitioning Creditors are correct when they argue that the mere existence of pending litigation, without more, does not create a bona fide dispute as to those claims, the court is bound to examine the circumstances surrounding the litigation to determine if the claim can be objectively considered the subject of a bona fide dispute as to liability or amount, or, as the case may be, contingent. "Bankruptcy courts routinely consider the existence and character of pending but unresolved litigation as evidence of a bona fide dispute."[94] As the Fifth Circuit explained in *In re Green Hills*, "a creditor whose claim is the object of unresolved, multiyear litigation should not be permitted to short-circuit that process by forcing the debtor into bankruptcy[,]"[95] noting, "the § 303(b) requirement exists to prevent that very use of involuntary bankruptcy."[96] In addition, the

---

[92] *See supra* note 27 and accompanying text.

[93] Division orders are documents issued by oil and gas companies to royalty owners listing that particular royalty owner's percentage interest, which the royalty owner confirms by signing and returning the division order.

[94] *In re Green Hills*, 741 F.3d at 659 (citing *In re TPG Troy, LLC*, 492 B.R. 150, 159-60 (Bankr. S.D.N.Y. 2013) (collecting cases in which courts have pointed to pending litigation in state court as evidence of a bona fide dispute under § 303(b)).

[95] *Id*. at 660.

[96] *Id*.

30

Fifth Circuit rejected the petitioning creditor's argument that "an offsetting counterclaim can *never* be the basis of a bona fide dispute[,]"[97] pointing out that with the changes made to section 303(b) in BAPCPA, "Congress has made clear that a claimholder does not have standing to file an involuntary petition if there is a 'bona fide dispute as to liability or ***amount***' of the claim."[98]

38. The Jack County Lawsuit Petitioners point to the Jack County Lawsuit as supporting their claims and justifying their standing to bring this Involuntary Petition. The burden shifts to Legacy to show that these claims are the subject of a bona fide dispute or contingent so as to preclude the Jack County Petitioners from having standing under section 303(b).[99] The court will address Legacy's argument that the Jack County Petitioners' claims are contingent, first, since a finding that the claims are contingent as to liability would preclude standing, even if their claims are not subject to a bona fide dispute as to liability or amount. Legacy argues that the Jack County Lawsuit Petitioners' claims are contingent as to liability because they failed to satisfy a condition precedent contained in the Leases before bringing the Jack County Lawsuit. Section 13 of the governing Leases, which provides that "[n]o litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least 180 days after Lessor has given Lessee written notice fully describing the breach or default, and then only if Lessee fails to remedy the breach or default, within such period"[100] Legacy introduced evidence at Trial, through the

---

[97] *Id.* (the Fifth Circuit pointed out that the petitioning creditor had only cited a single case that was decided under the pre-BAPCPA version of § 303(b) for the proposition that an unsubstantiated counterclaim does not call into question the validity of a debt and therefore cannot be evidence of a bona fide dispute).

[98] *Id.* (quoting § 303(b)(1) (emphasis added)).

[99] Standing under § 303(b) requires that a petitioning creditor hold a claim that is "not contingent as to liability or the subject of a bona fide dispute as to liability or amount." *See also In re Green Hills*, 741 F.3d at 655, 655 n.13 (to be a qualifying creditor under § 303(b), the claimholder's claim must not be contingent or the subject of a bona fide dispute as to liability or amount); *In re Intelligent Surveillance Corp.*, Case No. 21-31096-SGJ-7, 2012 WL 5871546, at *4 (Bankr. N.D. Tex. Dec. 10, 2021) (to become a "qualifying creditor" under § 303(b), a petitioning creditor "must hold a claim that is not contingent as to liability or the subject of a bona fide dispute . . . .").

[100] *See* Legacy Tr. Exs. 18-22 at § 13, DE # 46-17 through -21.

31

testimony of Angela Stegall, the Petitioning Creditors' only witness on behalf of the Jack County

Lawsuit Petitioners, that a December 19, 2024 demand letter sent by Mr. Buyse on behalf of the

landowners/lessors under the Leases just 34 days prior to the filing of the Jack County Lawsuit

was the first written notice provided to Legacy of its alleged breaches or defaults under the

Leases.[101] In addition, the letter contained no details or specific dollar amounts or calculations

explaining the alleged breaches and falls short of the "full" description required under § 13 of the

Leases. All of this matters because Texas courts enforce contractual conditions precedent to

bringing lawsuits, and hold that, where a contract makes notice and an opportunity to cure for a

certain period a prerequisite to litigation, the plaintiff's right to sue for alleged breach does not

accrue until the condition is satisfied.[102] Here, the Jack County Lawsuit Petitioners filed suit five

months too early. Thus, their royalty and bonus claims had not even accrued yet, and they have no

legal remedy under Texas law to enforce them. Their claims are contingent as to liability, and,

therefore, they do not have standing under section 303(b) here,[103] regardless of whether their

claims are the subject of a bona fide dispute as to liability or amount.

---

[101] *See* Tr. Transcript, Cross-Examination Testimony of Angela Stegall, DE # 71, 253:16-254:18 (where Ms. Stegall testified that she, personally, had never sent Legacy a letter notifying it of its alleged breach under the Lease and testified that the December 19, 2024 Letter sent by Mr. Buyse was possibly the first sent on her behalf, but she could not be 100 percent sure on that point). The court notes that the Jack County Lawsuit Petitioners did not point to any evidence that there exists a written demand notice that was sent prior to December 19, 2024.

[102] *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (where the Texas Supreme Court has held that "[a] condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation"); *Emerald Forest Utility Dist. v. Simonsen Const. Co., Inc.*, 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("When a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."); *see also Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 744-45 (Tex. App.—Dallas 2012, no pet.) (where the court rendered summary judgment on its contract claims because the claimant failed to satisfy a 30-day written notice provision, which the court held was a condition precedent to bringing suit).

[103] See, *In re Vitro Asset Corp.*, Case No. 11-32600-HDH-11, 2011 WL 1561025, at *3 (Bankr. N.D. Tex. Apr. 21, 2011), where Judge Hale dismissed the involuntary petition because the petitioning creditors had failed to satisfy a contractual condition precedent requiring demand in order for guarantor liability to be triggered, stating "Because the indentures require a demand on the guarantors and no such demand had been made when the involuntary petitions were filed, the obligations of the guarantors were not then due. Because the obligations were not due at filing, the guarantors' obligations were contingent as to liability. Accordingly, the [involuntary] petitions against the alleged debtors must be denied."

39. The court finds, in any event, that Legacy has met its burden of showing that the claims of the Jack County Lawsuit Petitioners are also the subject of a bona fide dispute as to liability or amount, which would preclude standing here as well. Legacy presented evidence that the Jack County Lawsuit Petitioners' claims had been paid in full, by pointing to the Jack County Lawsuit itself and to evidence of payment of amounts due under the Leases. Specifically, Legacy offered evidence at Trial of payments made to the Sparkman Group and to the Coody Group that represented full payment, and arguably overpayment, of amounts due under the Leases.[104] Two of the Jack County Lawsuit Petitioners testified at Trial that they, and possibly others, did not cash one or more checks they received from Legacy in 2024 that were written on the account of an entity named Summit Ventures Investments LLC ("Summit").[105] Regardless of whether some of the lease payments were cashed or returned, Legacy has at least introduced enough evidence to meet its burden of showing that the claims of the Jack County Lawsuit Petitioners are the subject of a bona fide dispute as to liability or amount. In addition, Legacy has introduced evidence in support of its argument that the claims of the Jack County Lawsuit Petitioners for underpaid royalties based on alleged "shaving" on behalf of Legacy are at least the subject of a bona fide dispute because, as landowners/lessors, they are bound by signed division orders, and Legacy paid royalties based on those orders.[106] Legacy introduced the division orders that were executed by the

---

[104] *See* Legacy's Tr. Exs. 27-38, DE ## 46-26 through -37; Tr. Transcript, Testimony of Andrew Gautreaux, DE # 71, 77:10-81:4. He also testified that a few of the landowners had refused payment. Tr. Transcript, Testimony of Andrew Gautreaux, DE # 71, 81:14-82:16; Legacy's Tr. Ex. 39.

[105] Mr. Gauthreaux testified that Summit is an oil company that he and a business partner started in April 2023. Ms. Stegall, part of the Coody Group, testified that she had not cashed an October 2024 check from Legacy because she did not know who Summit was, and Legacy's Tr. Ex. 38, copies of the front and back of the checks sent in 2024, corroborates that the check was never endorsed by Ms. Stegall. *See* Tr. Transcript, Testimony of Angela Stegall, DE # 71, 247:18-248:16. Virginia Newton, a member of the Sparkman Group of landowners/lessors, on the other hand, testified that she did not cash two checks, both written in June 2024, but the evidence shows that these two checks were, in fact, endorsed and deposited by Ms. Newton. *See* Tr. Transcript, Testimony of Virginia Newton, DE # 71, 301:8-304:3.

[106] Legacy argues that it is well-established under Texas law that division orders signed by a payee (like the individual Jack County Landowners/Lessors) are binding on that payee until revoked. Trial Brief, 15 (citing Tex. Nat.

individual royalty owners confirming their respective shares were correct.[107] The claimants did not introduce any evidence that these division orders had been revoked, and their own witness, Terri Asher, who is a senior landman whom the court found credible, confirmed that a signed division order controls the amount of royalties that are being paid unless and until it is revoked.[108] The court finds that this evidence further supports Legacy's argument that the Jack County Lawsuit Petitioners' claims are the subject of a bona fide dispute, which, in addition to the fact that these claims are contingent, precludes the Jack County Petitioners from having standing under section 303(b) to bring this Involuntary Petition.

40. <u>RICO Lawsuit Petitioners (Joint Venture Partners)</u>. This is the last group of Petitioning Creditors. As noted above, the petitioners are Joint Venture partners with Legacy,[109] and they are plaintiffs, along with Chance Smith and Derrick May, in the RICO Lawsuit pending in the federal district court for the Northern District of Texas. As noted above, Legacy is defending the RICO Lawsuit based on, among other reasons, its argument that the plaintiffs' claims are against the respective Joint Venture entity in which they invested, not against Legacy.

41. The RICO Lawsuit Petitioners have at least met their initial burden by pointing to the RICO Lawsuit. But, Legacy has introduced enough evidence, some of which was produced by the RICO Lawsuit Petitioners from their own records, to meet its burden of showing that the RICO Lawsuit

---

Res. Code § 91.402(g) ("division orders are binding for the time and to the extent that they have been acted on and made the basis of settlements and payments"); *Cabot Corp. v. Brown*, 754 S.W.2d 104, 107 (Tex. 1987) (where the Texas Supreme Court noted that it has held "that division orders executed by royalty owners, which obligated the lessees to pay royalties at lower rates than those required under the gas royalty clauses, are nevertheless binding on the royalty owners until revoked")).

[107] Legacy's Tr. Ex. 40.

[108] Tr. Transcript, Testimony of Terri Asher, DE # 71, 285:9-14.

[109] The RICO Lawsuit Petitioners identified the nature of their "claims" as "equity" in the Original Involuntary Petition, *see* Original Involuntary Petition, DE # 1, 11-18, but changed this description to "royalties" in the Amended Involuntary Petition. *See* Amended Involuntary Petition, DE # 41, 11-18. In the Response, these petitioners used the defined term "Investors" to describe themselves.

34

Petitioners' claims are at least the subject of a bona fide dispute as to liability or amount, including the Joint Venture Agreements themselves,[110] individual Joint Venture Partners' checks made payable to the Joint Venture entity they were investing in,[111] Legacy checks to the Joint Ventures, showing the flow of oil and gas revenues going from Legacy to the Joint Ventures and not to the individual venturers,[112] Joint Venture checks to the individual Joint Venture Partners,[113] Joint Venture K-1s issued to the Joint Venture partners,[114] and Joint Venture Partner execution documents.[115] The court finds that the RICO Lawsuit Petitioners do not have standing under section 303(b) to bring this Involuntary Petition. Their "claims" are the subject of a bona fide dispute.

## V.        Conclusion

For the reasons set forth above, the court concludes that none of the 24 Petitioning Creditors meet the requirements under section 303(b) to bring this Involuntary Petition against Legacy and that the Involuntary Petition should, therefore, be dismissed. ***All of the Petitioning Creditors' claims are the subject to a bona fide dispute as to liability or amount, and the Jack County Lawsuit Petitioners' Claims are also contingent***.

In light of this conclusion, the court need not address Legacy's supplemental argument that the Involuntary Petition should be dismissed on the independent basis that the Petitioning Creditors filed the case in bad faith or for improper purpose (which was essentially an argument that, even if section 303(b) standing was technically met, bad faith or improper purposes might still be a

---

[110] Legacy's Tr. Exs. 1-8.
[111] Legacy's Tr. Ex. 9.
[112] Legacy's Tr. Ex. 10.
[113] Legacy's Tr. Ex. 11.
[114] Legacy's Tr. Ex. 12.
[115] Legacy's Tr. Ex. 13.

standalone basis for dismissal). The court will have an opportunity to consider bad faith on the part of one or more of the Petitioning Creditors when it has a subsequent trial on whether section 303(i) damages should be awarded. The court can take judicial notice of the evidence from phase one of the Trial (some of which evidence was described herein) as well as consider additional evidence.

Additionally, the court need not address Legacy's supplemental argument that the court should dismiss the Involuntary Petition under the abstention provisions of section 305.[116]

Legacy is instructed to contact the courtroom deputy to set a date for an evidentiary hearing on the issue of whether Legacy is entitled to a judgment in its favor (i) against the Petitioning Creditors for costs and/or attorneys' fees under section 303(i)(1) and/or (ii) against any Petitioning Creditor that filed the petition in bad faith, for damages, including punitive damages, under section 303(i)(2). Legacy will bear the burden of proof by the preponderance of the evidence. Accordingly,

**IT IS ORDERED** that the Involuntary Petition be, and hereby is, dismissed because it is not supported by three or more Petitioning Creditors that have standing under section 303(b)(1) to bring it;

**IT IS FURTHER ORDERED** that the court reserves jurisdiction to consider granting a judgment in favor of Legacy for attorneys' fees, costs, and/or damages under section 303(i).

**It is so ordered.**

### ###END OF MEMORANDUM OPINION AND ORDER###

---

[116] Legacy argues in the alternative, if the court does not dismiss § 303, that this involuntary bankruptcy should be dismissed pursuant to § 305(a) of the Bankruptcy Code because the bankruptcy is not in the best interests of creditors. As support for their proposition, they argue that this is a two-party dispute and this Involuntary Petition was allegedly filed in bad faith and as a litigation tactic.

36