

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 16, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| Legacy Exploration, LLC | § | CASE NO. 25-34915-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

## MEMORANDUM OPINION AND JUDGMENT AWARDING BOTH ATTORNEYS' FEES AND PUNITIVE DAMAGES, PURSUANT TO 11 U.S.C. § 303(i)

### I.      Introduction

An involuntary Chapter 7 bankruptcy petition was filed against the above-referenced company (the "***Alleged Debtor***" or "***Legacy***") on December 8, 2025, by 23 purported creditors. An Amended Involuntary Petition ("***Involuntary Petition***") was filed on February 10, 2026, identifying as petitioning creditors 22 of the original 23 petitioning creditors and replacing one creditor that had withdrawn as a petitioner with a new creditor. In addition, yet another creditor joined in the Involuntary Petition on February 20, 2026, bringing to 24 the total number of petitioning creditors

("***Petitioning Creditors***"). The Alleged Debtor contested the Involuntary Petition with the filing of a Motion to Dismiss [1] on December 30, 2025—arguing that most, if not all, of the Petitioning Creditors lacked standing, pursuant to section 303(b)(1) of the Bankruptcy Code, as their claims were the subject of bona fide disputes. Additionally, the Alleged Debtor asserted bad faith and improper purpose as independent grounds for dismissal. Section 305 abstention was also urged by the Alleged Debtor. The Alleged Debtor asked that the Petitioning Creditors be required to post a bond pursuant to section 303(e) to indemnify it for any attorneys' fees, costs, and/or damages that the court may later allow under section 303(i).

The court held an initial status conference on the Involuntary Petition on January 6, 2026, and, after being apprised of the posture of the matter, ruled that it would conduct an initial hearing on the Alleged Debtor's request for the posting of a bond ("***Bond Hearing***"),[2] and then bifurcate the ultimate trial on the Involuntary Petition into two phases.

The first phase of the trial would be an evidentiary hearing to determine whether a sufficient number of the Petitioning Creditors had standing to file the Involuntary Petition under section 303(b) or, alternatively, whether bad faith or improper purpose might exist and be independent grounds for dismissal (in other words, even if a sufficient number of Petitioning Creditors had technical standing pursuant to section 303(b)(1)).

The second phase of the trial would hinge on the result of phase one:  (a) if the court determined in phase one that a sufficient number of the Petitioning Creditors had standing under section 303(b) and "bad faith" and improper purpose did not exist or serve as an independent

---

[1] Motion to Dismiss Involuntary Petition and Brief in Support, DE # 13. The Petitioning Creditors filed their response brief ("***Response***"), DE ## 21, 22, on January 20, 2026, and Legacy filed its reply brief ("***Reply***"), DE # 36, on February 3, 2026. In addition, Legacy filed a trial brief ("***Trial Brief***"), DE # 61, on February 23, 2026.

[2] Following this Bond Hearing, which was held on February 2, 2026, the court denied without prejudice the Alleged Debtor's bond request.

2

grounds for dismissal—then a second evidentiary hearing would be set to determine whether the Alleged Debtor was generally paying its debts as they became due (see section 303(h));[3] or (b) if the court determined in phase one that an insufficient number of the Petitioning Creditors had standing under section 303(b) or that bad faith and improper purpose existed and served as independent grounds for dismissal—then a second evidentiary hearing would be set to determine whether the Alleged Debtor would be entitled to a judgment in its favor (i) against the Petitioning Creditors for costs and attorneys' fees under section 303(i)(1) and/or (ii) against any Petitioning Creditor that filed the Involuntary Petition in bad faith, for damages, including punitive damages, under section 303(i)(2).

The court held an evidentiary trial on the first phase (the "***First Trial***") on February 24 & 27, 2026. The court, in *Memorandum Opinion and Order Granting Dismissal of Contested Involuntary Bankruptcy Petition* entered April 3, 2026, determined that the Petitioning Creditors did not meet the standing requirements under section 303(b)(1) and granted the Alleged Debtor's Motion to Dismiss (the "***Dismissal Order***" or the "***Dismissal Opinion***").[4]

The court held an evidentiary trial on the second phase (the "***Second Trial***") on June 10, 2026, to determine if the Petitioning Creditors acted in bad faith and if Legacy was entitled to costs, attorneys' fees and/or punitive damages. This constitutes the court's findings of fact, conclusions of law and ruling, pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.

As explained below, the court has determined that the Alleged Debtor established, at the Second Trial, its entitlement to an award of reasonable attorneys' fees and costs, pursuant to section

---

[3] The Alleged Debtor's counsel acknowledged, on the record at the February 2, 2026 Bond Hearing, that the Alleged Debtor is not paying its debts as they come due: "This Debtor has not been operating since '22, when the employees took and stole all the Debtor's assets. As a result, I can't stand here to this Court and say, yes, we're paying our debts as they come due. They can't pay their debts." Transcript of February 2, 2026 Bond Hearing, DE # 43, 14:3-7. Thus, by the time the phase one evidentiary hearing was held in late February, it was not disputed that the Alleged Debtor was generally not paying its debts as they came due.

[4] *In re Legacy Expl., LLC, No*. 25-34915-SGJ-7, 2026 LEXIS 121788 (Bankr. N.D. Tex. 2026).

303(i)(1). Accordingly, **all Petitioning Creditors** will be jointly and severally liable for Legacy's reasonable attorneys' fees and costs incurred in connection with the Involuntary Petition—as established by the evidence—in the aggregate amount of **$216,144.25**.[5] Furthermore, the court finds that **one of the Petitioning Creditors** acted in bad faith under section 303(i)(2) in the filing of the Involuntary Petition: Trojan Tubular Services, LLC ("**Trojan**"). Accordingly, Trojan will be liable to Legacy for punitive damages in the amount of **$100,000**—which is an amount that this court deems appropriate under the facts and circumstances of this case.

## II.    Background Facts

1.    The court incorporates into this opinion, all findings of fact cited in its Dismissal Opinion. The court highlights below the facts most important to this second phase of the trial.

2.    Legacy is an oil and gas company that identifies areas to develop oil and gas projects, obtains oil and gas properties to develop, and raises money to fund the drilling from numerous investors. Legacy's chief executive officer ("**CEO**") is an individual named Andrew Gautreaux ("**Gautreaux**"), and its assets are primarily its oil and gas leases in Jack County, Texas and Clay County, Texas. There was a deluge of litigation that preceded the filing of the Involuntary Petition; most of the Petitioning Creditors were involved in at least one of these actions and most of the actions are still pending. The law firm of Nelson Mullins Riley & Scarborough LLP ("**Nelson Mullins**"), and its attorney Brent Buyse ("**Buyse**") represent 23 of the 24 Petitioning Creditors, and it also represents, or has represented, Legacy's adversaries in those suits. The court described these proceedings more extensively in the Dismissal Opinion but briefly summarizes them again here for the sake of clarity and readability.

3.    The Trade Secrets Litigation. In 2021, several individuals working for Legacy

---

[5] This amounts constitutes almost entirely fees (as opposed to costs) and is divided between two law firms.

including Derrick May ("*May*") (Legacy's chief financial officer), Chance Smith ("*Smith*") (an employee or contractor-for-services), and various members of Legacy's sales team departed from Legacy and formed a competing company, Optimum Energy Partners, LLC ("*Optimum*"). Legacy thereafter sued Optimum, May, Smith, and others (the "*Optimum Defendants*") in 2022 (the "*Trade Secrets Litigation*"),[6] alleging that they stole Legacy's business and trade secrets. The Trade Secrets Litigation remains pending.

4.      The Trager Judgment. Weeks before trial was set in the Trade Secrets Litigation, Trojan, a company that is substantially owned by Smith (who, as noted above, formerly worked for Legacy, then co-founded Optimum, and then was sued by Legacy in the Trade Secrets Litigation as one of the "Optimum Defendants") acquired a roughly $1 million default judgment that had been entered against Legacy in a different case  (the "*Trager Judgment*").[7] Trojan, a Petitioning Creditor in the present case, paid $500,000 for the acquisition of the Trager Judgment, an amount that was funded in full by Optimum, via a loan to Trojan. Trojan then tried, in state court, to use the newly acquired Trager Judgment to take control over (or perhaps offset) Legacy's claims in the Trade Secrets Litigation, through the vehicle of a state court turnover motion.  The state court turnover motion was denied. In any event, Legacy disputes that the Trager Judgment is enforceable because of an alleged stipulation that had been reached with the original holder of the Trager Judgment.

5.      The Tortious Interference Litigation. Legacy next sued Trojan and the Optimum Defendants in 2024 for tortious interference under the belief that Trojan's purchase of the Trager Judgment was an improper attempt to exert control over the Trade Secrets Litigation (the "*Tortious*

---

[6] *Legacy Expl., LLC v. Optimum Energy Partners, LLC et al., Case No. 3:22-cv-794-S* (N.D. Tex.).
[7] Civil Action No. DC-23-08138 in the 162nd Judicial District Court of Dallas County, Texas.

*Interference Litigation*").[8] The Tortious Interference Litigation is still pending.

6.      The Texas Railroad Commission Litigation. Meanwhile, in certain proceedings before the Texas Railroad Commission, a competitor of Legacy named Delfin Operating, LLC ("*Delfin*"), owned by an individual named Ralph Rather ("*Rather*"), sought to replace Legacy as operator on certain oil and gas leases in Jack County, Texas and Clay County, Texas. As it turns out, Delfin and Rather were closely allied with Optimum in the litigation efforts against Legacy during this time frame, with Delfin having obtained "top" leases on several of Legacy's oil and gas leases with the intent or desire to take over the leases as operator.[9] The Commission ruled in favor of Legacy in the proceedings and, thus, Delfin and Rather did not end up replacing Legacy on these leases.

7.      The Jack County Lawsuit. Still further, in January 2025, certain Jack County landowners (11, to be exact), joined by N&R Resources Inc., a company also owned by Rather, sued Legacy for allegedly unpaid or underpaid royalties and bonuses under their leases (the "*Jack County Lawsuit*").[10] The 11 landowners were represented by Nelson Mullins and Buyse in the Jack County Lawsuit, the same law firm and lawyer that represent those same Petitioning Creditors in the Involuntary Petition (the "*Jack County Lawsuit Petitioners*"). Legacy maintains that it has paid all Jack County Lawsuit Petitioners in full.

---

[8] *Legacy Exploration, LLC v. Trojan Tubular Services, LLC, et al.,* DC-24-05229 in the 162nd Judicial District Court of Dallas County, Texas.

[9] A "top" lease is a new oil and gas lease executed by a mineral owner while an existing (or "bottom") lease is still active on the same property, becoming effective if and only if the bottom lease is terminated by its terms at lease expiration or prematurely due to lack of production. See *TRO-X, L.P. v. Anadarko Petroleum Corp.,* 548 S.W.3d 458, 462 (Tex. 2018) (cleaned up) ("Basically, a top lease is a subsequent oil and gas lease which covers one or more mineral interests that are subject to a valid, subsisting prior lease . . . that becomes effective as to those mineral interests subject to a bottom lease only upon termination of the bottom lease."). At that point the holder of the top lease would gain access to the property and the right to act as the new operator. So, Delfin needed Legacy's bottom lease to be declared terminated so that it could take over as operator under its top leases.

[10] *N&R Resources, Inc., et al. v. Legacy Exploration, LLC, et al.,* in the 271st Judicial District of Jack County, Texas, Case No. 25-01-009.

8.      The RICO Lawsuit. In October 2025, a group of investors, represented once again by Nelson Mullins and Buyse, sued Legacy for civil RICO violations, securities fraud, and common-law fraud, seeking the return of funds they had invested (the "**RICO Lawsuit**").[11] Nine of the 12 plaintiffs are Petitioning Creditors (the "**RICO Lawsuit Petitioners**"). The Involuntary Petition was filed just a few weeks after the filing of the RICO Lawsuit, and just days before a response to Legacy's motion to dismiss was due.

9.      The 24 creditors fall into four groups: (1) Trojan, as holder of the purchased Trager Judgment; (2) four trade creditors including (once again) Trojan, Quasar Energy Services, Inc. (**Quasar**"), Duncan Oilfield Construction & Equipment Sales, Inc. ("**Duncan**"), and Byrd Oilfield Services, LLC ("**Byrd**"); (3) the 11 Jack County Lawsuit Petitioners[12] and; (4) the nine Rico Lawsuit Petitioners.[13] All are represented by Nelson Mullins except Byrd, which appeared through separate counsel.

10.      After the court dismissed the Involuntary Petition in the First Trial due to the lack of standing on the part of each Petitioning Creditor (with the court concluding that there were bona fide disputes as to all of them), the court convened the Second Trial on June 10, 2026, to determine whether Legacy was entitled to costs, attorneys' fees, and perhaps actual and punitive damages under section 303(i).

11.      Section 303(i)(1) permits the court, in its discretion, to award Legacy its costs or reasonable attorneys' fees against the Petitioning Creditors (regardless of whether there is a finding of bad faith). Section 303(i)(2) permits the court to award damages, including punitive damages,

---

[11] *Philip Allen, et al. vs. Legacy Exploration, LLC, et al*, Case No. 3:25-cv-2806-L (N.D. Tex.).
[12] Freda Sparkman Family Trust, Sally Marshall, Nancy Bagoly, Virginia Newton, George Sparkman, Monica Alexander, Betty J. Sparkman, Cynthia Johns, Angela Steagall, Warren Coody, and Ruth Coody.
[13] Phil Allen, Cary Battishill, Aaron Dahl, Michael Dilick, Rodney Eaton, Nam Ko, Kareny Kyman, Jay Mckinney, and Deryl Peoples.

against any Petitioning Creditor that filed the Involuntary Petition in bad faith. The parties agreed that the evidence from the First Trial, including all testimony and exhibits, would be carried into the Second Trial, and the court takes judicial notice of that record. Legacy has filed a separate motion for sanctions against Nelson Mullins under Rule 9011 that has been severed, at the request of Nelson Mullins, and is set for a separate hearing in August.

### III.    Jurisdiction

12.    This court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matter presently before the court constitutes a core proceeding that this court may hear and determine on a final basis under 28 U.S.C. § 157(b) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute—11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtor has its business headquarters in this district.

### IV.    Reasonable Attorneys' Fees Under 303(i)(1).

13.    A bankruptcy court has discretion under 11 U.S.C. § 303(i)(1) to grant a judgment in favor of an alleged debtor for its costs and reasonable attorneys' fees when the court dismisses an involuntary bankruptcy petition without the consent of all parties.[14]

Section 303(i)(1) of the Bankruptcy Code specifically provides as follows:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
>
> (1)    against the petitioners and in favor of the debtor for –

---

[14] *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 661 (5th Cir. 2014).

(A) costs; or

(B) a reasonable attorney's fee…

11 U.S.C. § 303(i)(1).

14.     It is undisputed that the court dismissed this Involuntary Petition on April 3, 2026, without the consent of any of the 24 Petitioning Creditors. Furthermore, there is nothing in the record to indicate that the Alleged Debtor waived its right to judgment under section 303(i). Accordingly, this court has the discretion to choose whether it will award attorneys' fees and costs.

15.     This court has previously held that with respect to attorneys' fee shifting under section 303(i)(1), the court should look at the totality of the circumstances, and no presumption applies in favor of either party.[15]

16.     In analyzing the totality of the circumstances to determine whether an award of attorneys' fees and costs is proper under § 303(i)(1), bankruptcy courts in Texas have used a four-factor test.[16] These factors include (1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the motivation and objectives behind the filing of the involuntary petition.[17]

17.     First, this court looks at the merits of the involuntary petition. As this court concluded in the Dismissal Opinion, none of the 24 Petitioning Creditors met the requirements under section 303(b) and did not have standing to bring this Involuntary Petition.

18.     To have statutory standing to bring an involuntary petition, a petitioning creditor's claims must not be subject to dispute as to amount or liability. This court previously found that all

---

[15] *In re Synergistic Techs., Inc.*, No. 07-31733-SGJ-7, 2007 Bankr. LEXIS 2660 at *15 (Bankr. N.D. Tex. 2007).

[16] *In re HL Builders, LLC*, 630 B.R. 32, 40 (Bankr. S.D. Tex. 2020); *In re Griffin*, No. 23-32658, 2023 Bankr. LEXIS 2596 at *12 (Bankr. S.D. Tex. 2023).

[17] *In re Griffin*, 2023 Bankr. LEXIS 2596 at *12.

Petitioning Creditors' claims were subject to a bona fide dispute as to liability or amount and the Jack County Lawsuit Petitioners' Claims were also contingent. Because the claims were disputed, the Petitioning Creditors had other avenues of judicial resolution prior to filing the Involuntary Petition. Accordingly, this factor weighs in favor of awarding attorneys' fees to Legacy.

19.     Second, no evidence was provided at either hearing to suggest that the Alleged Debtor engaged in any improper conduct.

20.     Third, we turn to the reasonableness of the Petitioning Creditors' actions. "Creditors are justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to insure [sic] an orderly ranking of creditors' claims and to protect against other creditors obtaining a disproportionate share of debtor's assets."[18]

21.     This court is not convinced that the facts of this case call for resolution under its *exclusive* bankruptcy powers. The disputes here can be resolved by other judicial avenues. In fact, as discussed, the 11 Jack County Landlord Petitioning Creditors already commenced a state-court action against Legacy in the 271st Judicial District of Jack County, Texas for alleged unpaid or underpaid royalties allegedly due to the leaseholders from Legacy. Accordingly, it is not within the *exclusive* power of the bankruptcy court to settle this issue. The existence of the Jack County Lawsuit itself is evidence that there are other avenues through which the Petitioning Creditors could be made whole.

22.     Relatedly, nine of the Petitioning Creditors are also plaintiffs in the RICO Lawsuit against Legacy filed in the Northern District of Texas District Court. Through this suit, the RICO Plaintiffs seek recovery of their investment funds. This suit was in progress, and pleadings were

---

[18] *In re Clean Fuel Techs. II, LLC,* 544 B.R. 591, 604 (Bankr. W.D. Tex. 2016).

being filed at the time the Involuntary Petition was filed. As with the Jack County Lawsuit, the RICO Lawsuit evidences another avenue through which some of the Petitioning Creditors could be made whole. Accordingly, this factor weighs in favor of awarding attorneys' fees to Legacy.

23. Fourth, as discussed further below, the court believes that the motivations and intentions of the Petitioning Creditors were less than pure. While the court further examines the issue of bad faith below in connection with its section 303(i)(2) analysis (and bad faith is not required to shift attorneys' fee under section 303(i)(1)), the court will nevertheless focus briefly here on the motivations and intentions of the Petitioning Creditors, as this somewhat affects how the court should exercise its discretion under section 303(i)(1). The court already determined after the First Trial that a bona fide dispute existed as to the claim of every Petitioning Creditor. Moreover, nearly all of the Petitioning Creditors had less severe means of resolution than the filing of an involuntary bankruptcy case. There is no legitimate argument that the Petitioning Creditors were unaware of these factors, particularly the latter factor, as the counsel for Petitioning Creditors in this case is the same counsel representing the same parties in the various related lawsuits.

24. The court also notes that, while the analysis here deals with only the motivations and intentions of the Petitioning Creditors, it is worth observing that there is a non-party here whose involvement with the Petitioning Creditors looms large over this case. This non-party's involvement behind the scenes is not dispositive of the court's findings herein—and the court would come to the same result regardless—but, in analyzing the totality of the circumstances, the court finds it necessary to discuss this non-party.

25. The non-party is Ralph Rather. As discussed previously, Rather owns a competitor of Legacy called Delfin Operating, LLC. As this court discussed in the Dismissal Opinion, Delfin had obtained "top" leases on several of Legacy's oil and gas leases with the intent or desire to take

11

over the leases as the operator. Additionally, N&R Resources Inc., which is another company of Rather's, was a plaintiff in the Jack County Lawsuit.

26.     While Rather and his companies are not Petitioning Creditors in this case, his influence is still clear. Tim Sicking ("**Sicking**") testified that his company, Quasar (one of the four trade creditor Petitioning Creditors), joined the Involuntary Petition because Rather asked him to do so. In Sicking's own words, Delfin (another of Rather's companies) was a partner of Quasar's that "actually pays their bills."[19] Furthermore, this Involuntary Petition and the related attorneys' fees of the Petitioning Creditors were being funded by Rather and his companies, though Rather himself is not a Petitioning Creditor. To this point, Sicking testified that, if he had to pay attorneys' fees, he would not be part of the bankruptcy proceeding.[20]

27.     Rather's involvement behind the scenes is relevant because, as evidenced by Sicking's testimony, it is likely that at least one Petitioning Creditor's signature on the Involuntary Petition was motivated at least in part by a desire to maintain a good working relationship with Rather, and not by the desire to recover on a claim against Legacy in bankruptcy. While the court does not believe this is clear bad faith, it also does not demonstrate purity of intention on the Petitioning Creditor's part when filing the Involuntary Petition.

28.     For the reasons discussed, this court has determined that the motivations and objectives of the Petitioning Creditors weigh in favor of a judgment awarding costs and attorneys' fees to Legacy, because the motives of the Petitioning Creditors were not entirely appropriate, reasonable, and in good faith.

29.     As noted, under section 303(i)(1), the court "may grant judgment against the

---

[19] Second Tr. DE # 128, 40: 12-13, June 10, 2026.
[20] Second Tr. DE # 128, 41: 24-25, June 10, 2026.

petitioners and in favor of the debtor for costs or a reasonable attorney's fee…"[21] The use of the word "may" in this provision gives the court the discretion not only to determine whether attorneys' fees should be shifted but also to determine whether **all** Petitioning Creditors should be held jointly and severally liable for the attorneys' fees and costs. In considering the totality of the circumstances, the court has determined that, indeed, all Petitioning Creditors should be held jointly and severally liable for Legacy's reasonable costs and attorneys' fee. That there are 24 Petitioning Creditors makes this an unusual case. Not every creditor testified.  Therefore, it is difficult for the court to discern the exact motive and intention of each creditor. However, it is known to the court that none of the Petitioning Creditors is paying for attorneys' fees; the Involuntary Petition, instead, is being funded fully by Delfin and Rather. Moreover, nearly all Petitioning Creditors are involved in litigation against or related to Legacy outside of this case and this court. For these reasons and the reasons above, this court determines that it is appropriate to hold all Petitioning Creditors jointly and severally liable for Legacy's reasonable costs and attorneys' fees. The evidence showed that these reasonable fees and costs amounted to $216,144.26.[22]

## V.     Bad Faith Under Section 303(i)(2)

30.     Section 303(i)(2) allows a court, upon its dismissal of an involuntary petition, to render a judgment of proximate and punitive damages against any petitioning creditor who filed the petition in bad faith. "[W]ith respect to proximate and punitive damages, courts addressing the issue agree that '[t]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith.'"[23] This court further supported this standard

---

[21] 11 U.S.C. §303(i)(1).
[22] *See* Legacy's Tr. Exs. 57-58, DE #115.
[23] *In re TRED Holdings, L.P.*, No. 10-40749, 2010 Bankr. LEXIS 3109, 2010 WL 3516171, at *7 (Bankr. E.D. Tex. Sept. 3, 2010) (quoting *In re John Richards Homes Bldg. Co.*, 291 B.R. 727, 729-30 (Bankr. E.D. Mich. 2003)).

13

by stating in the Dismissal Opinion that in proving the bad faith issue, "Legacy will bear the burden of proof by the preponderance of the evidence."[24]

Section 303(i)(2) of the Bankruptcy Code specifically provides:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment –
>
> * * *
>
> (2) against any petitioner that filed the petition in bad faith, for –
>     (A) any damages proximately caused by such filing; or
>     (B) punitive damages.

11 U.S.C. § 303(i)(2)

31.     "A determination of bad faith is generally predicated upon a finding that the petitioning creditor acted with wrongful motives, wrongful objectives, or both."[25] This court previously held in *In re Synergistic Techs., Inc.*, that to determine bad faith in the filing of an involuntary petition, a court must "turn to the totality of the circumstances here—considering such things as actions, motives and objectives of the parties."[26]

32.     The Fifth Circuit considers both subjective and objective factors in determining whether an involuntary petition was filed in bad faith. In *In re Sims*, the Fifth Circuit stated that the criteria for bad faith include motivations to file by "ill will, malice, or for the purpose of embarrassing or harassing the debtors."[27] In *Sims*, the Fifth Circuit also found that an involuntary petition was not filed in bad faith because the creditor conducted a reasonable inquiry into the facts and the law prior to filing the petition.

---

[24] *In re Legacy Expl., LLC,* 2026 LEXIS 121788, at *36.
[25] *In re Kennedy,* 504 B.R. 815, 824 (Bankr. S.D. Miss. 2014).
[26] 2007 Bankr. LEXIS 2660 at *7.
[27] *Subway Equip. Leasing Corp. v. Sims*, 994 F.2d 210, 221 (5th Cir.1993).

33.     This court has previously adopted the majority position that, when applying section 303(i)(2), there is a presumption that the petitioning creditors acted in good faith in filing an involuntary position and that the alleged debtor has the burden of proving bad faith by a preponderance of the evidence.[28] This court has also previously held that punitive damages may be awarded under section 303(i)(2) in the absence of actual damages.[29]

34.     Accordingly, this court will look to the record to determine whether sufficient evidence exists to support the conclusion that the Petitioning Creditors acted with wrongful motives, objectives, or both, or were motivated by ill will, malice, or acted with the purpose of embarrassing or harassing the debtor—such that the presumption that the Petitioning Creditors acted in good faith would be rebutted.

35.     Legacy contends that the Involuntary Petition was a bad-faith litigation tactic. It points out that the law firm of Nelson Mullins represents the Optimum Defendants, Trojan, Delfin, the Jack County Lawsuit Petitioners, and the RICO Lawsuit Petitioners, and that this convergence shows the Involuntary Petition was meant, more than anything, to stall the Alleged Debtor's recovery in the Trade Secrets Litigation.

36.     This case deals with a set of facts that differ slightly from the vast majority of involuntary cases in the world of bankruptcy. This case has *24* Petitioning Creditors, instead of the usual three or so. The language of section 303(i)(2) states that the court may grant judgment against *any* petitioner that filed the Involuntary Petition in bad faith. This court reads this plain language to indicate that the bad faith determination is made on a creditor-by-creditor basis.

37.     Of the 24 Petitioning Creditors, only six testified in either the First Trial or the Second Trial. Those parties were Chance Smith (as a representative for and part owner of Trojan),

---

[28] *In re Synergistic Techs., Inc.,* 2007 Bankr. LEXIS 2660 at *14.
[29] *Id.* at *15.

Tim Sicking (as a representative for and president of Quasar), Deryl Peoples ("*Peoples*") (a RICO Lawsuit Petitioner), Angela Steagall ("*Steagall*") (a Jack County Lawsuit Petitioner), Sally Marshall ("*Marshall*") (a Jack County Lawsuit Petitioner), and Virginia Newton ("*Newton*") (a Jack County Lawsuit Petitioner). As to the 18 Petitioning Creditors who did not testify, the court does not find sufficient evidence in the record from the Alleged Debtor to rebut the presumption of good faith.

38.    At most, the Alleged Debtor put into the record facts to show generally that all Petitioning Creditors had their attorneys' fees related to this Involuntary Petition paid for by Rather, and that all Petitioning Creditors were involved with Legacy prior to the Petition Date, either through the several lawsuits mentioned above, or through general business relationships and/or contractual relationships. While the failure to pay their own fees, and the looming presence of Rather over this matter (waiting in the wings to realize the value of his top leases on the Alleged Debtor's leases) casts a dark shadow in this matter over the actions of the Petitioning Creditors that is troubling, this is not enough to overcome the presumption of good faith and show that the non-testifying Petitioning Creditors acted in bad faith. In fact, without the testimony of certain Petitioning Creditors, it is difficult if not impossible for the court to determine if these creditors acted with ill will, malice, or intentions to harass or embarrass Legacy. Therefore, the court finds there was no bad faith on the part of the 18 creditors who did not testify.[30]

39.    As to the six creditors who did testify, the court finds that there is only enough evidence in the record to rebut the presumption of good faith *against Trojan* based on the testimony of Chance Smith.

---

[30] Duncan, Byrd, Freda Sparkman Family Trust, Nancy Bagoly, George Sparkman, Monica Alexander, Betty J. Sparkman, Cynthia Johns, Warren Coody, Ruth Coody, Phil Allen, Cary Battishill, Aaron Dahl, Michael Dilick, Rodney Eaton, Nam Ko, Kareny Kyman, and Jay Mckinney.

A.  The RICO and Jack County Lawsuit Petitioners

1.  *Deryl Peoples*

40.  As to Deryl Peoples, the court found his testimony credible and has determined there is no bad faith on the part of Peoples. Peoples testified that he had invested $85,000 with Legacy into a joint venture.[31] Peoples also testified that, if Rather had not funded the attorneys' fees for the Involuntary Petition, he would not have been able to pursue it here.[32] Peoples testified that he was approached by attorney Brent Buyse to join the Involuntary Petition[33] and that he signed on to the Involuntary Petition in the hopes of regaining some of the money he invested into Legacy that did not produce returns and believed at the time that there would be a strength in numbers in the filing of the Involuntary Petition to attempt to regain lost funds.[34]

41.  In his testimony, Peoples demonstrated a lack of clarity regarding the difference between the RICO litigation and this Involuntary Petition. When asked if he was aware he was a party to a RICO Lawsuit, he stated that he had "never heard of it before."[35]  When asked again to confirm that he was "unaware that [he was] a plaintiff in [the RICO] Lawsuit that was filed," Peoples said that he "knew [he] was going to be here today."[36] He further stated that he knew he "was going to be part of this thing, but [he] did not know what a RICO [was]."[37] Therefore, although his name is attached to an ongoing litigation, this court does not believe Peoples specifically intended to use this bankruptcy as a way to circumvent the correct litigation channels. This court believes that Peoples, like many of the other Petitioning Creditors, believed filing this Involuntary Petition was the best chance he had at regaining his lost money. Accordingly, this court

---

[31] First Tr. DE # 71, 214: 16-24, February 24, 2026.
[32] First Tr. DE # 71, 227: 9-16, February 24, 2026.
[33] First Tr. DE # 71, 229: 11-22, February 24, 2026.
[34] First Tr. DE # 71, 237: 9-12, February 24, 2026.
[35] First Tr. DE # 71, 228: 5-8, February 24, 2026.
[36] First Tr. DE # 71, 228: 16-20, February 24, 2026.
[37] First Tr. DE # 71, 228: 24-25, February 24, 2026.

finds that Peoples did not act in bad faith when filing this Involuntary Petition.

### 2. *Angela Steagall*

42.     Angela Steagall is a landowner/lessor.  The court also finds that Angela Steagall's testimony was credible and indicated that Steagall did not file this Involuntary Petition in bad faith. Steagall testified that she became involved through her elderly uncle, Warren Coody, who owns half of the interest in a property in Jack and Clay County on which Legacy was drilling.[38] She testified that she owns a one-fourth interest in the same property and when Warren Coody asked her to join the Involuntary Petition, she agreed to support him.[39] More specifically, Steagall testified that she was not worried about whether or not she got money,[40] rather, she was worried on behalf of her elderly uncle, sister, and aunt, who would be unable to appear in significant part in court.[41] In particular, Steagall testified that she joined the Involuntary Petition because her uncle was "hopping mad"[42] that certain "things that were promised" by Legacy, like checks that they anticipated receiving that "didn't come to fruition."[43] Steagall testified that she "wanted to be able to help [her family], and help their neighbors to try and get some justice." [44]

43.     Steagall's testimony did not indicate an intention to file this Involuntary Petition in bad faith, and does not indicate any ill will or malice toward Legacy. Steagall's testimony, instead, indicated a desire to aid and protect her family and the resources that they have.

### 3. *Sally Marshall*

44.     Sally Marshall is another one of the Petitioning Creditors who is a landowner/lessor and is also involved in the Jack and Clay County Lawsuits. When asked directly if she held any

---

[38] First Tr. DE # 71, 241: 5-10, February 24, 2026.
[39] *Id.*
[40] First Tr. DE # 71, 250: 1-2, February 24, 2026.
[41] First Tr. DE # 71, 250: 2-3, February 24, 2026.
[42] First Tr. DE # 71, 250: 17, February 24, 2026.
[43] First Tr. DE # 71, 250: 9-13, February 24, 2026.
[44] First Tr. DE # 71, 250: 19-21, February 24, 2026.

malice or ill will toward Legacy, Marshall testified that, while she thought they did not "do good business," she "didn't hate Andrew [Gautreaux]" and thought he had "just lost his business acumen."[45] Marshall further testified that she did not join this Involuntary Petition with any intent to embarrass or harass Legacy and that her understanding was that, if bankruptcy worked the way she understood it was supposed to, they might have been able to collect some of their lost funds through this Involuntary Petition.[46]

45.     Like many other Petitioning Creditors in this case, Marshall was approached by Rather, whom she testified told her that by filing the Involuntary Petition, a trustee would look at all of Legacy's assets and this might result in a release of the leases which would allow the Petitioning Creditors to try and get production out of their wells.[47] Importantly, Marshall testified that "it wasn't a guarantee for Ralph [Rather]" that he would operate the wells controlled by Marshall if this Involuntary Petition did result in a release of the Legacy leases.[48] Marshall repeatedly testified that, in deciding to join this Involuntary Petition, her understanding was that it could result in the lease with Legacy being released and that this was a driving force behind her choosing to file the Involuntary Petition.[49]

46.     The court finds Marshall's testimony credible and does not believe she joined this Involuntary Petition with the intention of harassing or embarrassing the Alleged Debtor, nor did she have ill will or malice. While Marshall's testimony indicated frustration with a business deal that she perceived had gone wrong and was no longer economically beneficial, the court does not think this rose to the heightened level of ill will or malice. Moreover, Marshall never indicated she

---

[45] Second Tr. DE #128, 55: 19-21, June 10, 2026.
[46] Second Tr. DE #128, 55: 4-5; 22-24, June 10, 2026.
[47] Second Tr. DE #128, 61:  7-11, June 10, 2026.
[48] Second Tr. DE #128, 61: 12-16, June 10, 2026.
[49] Second Tr. DE #128, 63: 19-23, June 10, 2026.

was trying to gain an undue advantage over Legacy in the filing of this Involuntary Petition. She testified that she thought the lease with Legacy had been "expired for four years."[50] Although Marshall's intention did seem to be to remove Legacy from the lease, the court does not believe this rises to the level of an 'undue advantage,' especially when Marshall credibly testified that she believed that the lease had been expired for four years. Marshall's intentions in filing this case do not seem to be bad faith to this court. Instead, these seem like the motivations of a businessperson and landowner who is trying to get what she believes to be justice. These motivations, coupled with a lack of sophisticated understanding of the law and the Bankruptcy Code, may have resulted in Marshall going about her goals in a way that might have been, to some degree improper, but the court does not believe that this rises to the level of bad faith.

### 4. *Virginia Newton*

47.     As to Virginia Newton, another landowner/lessor, the court finds that she did not act in bad faith in the filing of the Involuntary Petition, and her testimony credibly reflects this conclusion. Newton testified that she believed she was owed gas royalties from Legacy that remained unpaid.[51] Newton further testified that she agreed to participate in this Involuntary Petition because Rather asked her to.[52] More specifically, Rather asked if she would sign a top lease with him, and Newton agreed because she believed that her land and oil was being unused and she wanted to realize the benefits of her land and oil.[53] She further stated that she just "wanted justice to prevail."[54] As with the other creditors already discussed, this is not an instance of Newton wanting to harm Legacy or acting with ill will or malice, but rather an instance of a creditor

---

[50] Second Tr. DE #128, 63: 22, June 10, 2026.
[51] First Tr. DE # 71, 293: 2-4, February 24, 2026.
[52] First Tr. DE # 71, 295: 13-25, February 24, 2026.
[53] First Tr. DE # 71, 295: 18-23, February 24, 2026.
[54] First Tr. DE # 71, 295: 24-25, February 24, 2026.

20

wanting to get what she believed she was owed and believing that the court system and bankruptcy was the best way to obtain that.

48.     In the case of each of the four Petitioning Creditors described in this section, the court finds that there was no bad faith. There is no evidence in the record to show that any of these four Petitioning Creditors intended to cause harm to the Alleged Debtor or acted with ill will or malice toward the Alleged Debtor. As to the landowners/lessors in particular, they agreed to business deals (i.e., leases) that they believed were not realizing their full potential. None of them put themselves out as sophisticated users of the law, and readers of this opinion will understand that the law is complicated, and a niche area such as bankruptcy even more so. It is reasonable to this court that these Petitioning Creditors extended value to Legacy (in the case of Peoples, an investment of funds; in the case of the landowners/lessors, the right to extract minerals), believed that they were not achieving the value that was owed back to them, and were seeking to either receive an accounting and possible unpaid amounts or a termination of the underlying leases.  They had been led to believe by Rather and the lawyers representing the Petitioning Creditors that the Involuntary Petition was a reasonable legal means to achieve a return of value to them. The credible testimony of each witness further supports this point.

B.  Quasar

49.     The court had slightly more trouble in determining if Sicking, the representative for and 100% owner of trade vendor Quasar, acted in bad faith when filing this Involuntary Petition. Portions of Sicking's testimony in the Second Trial were inconsistent with his testimony in the First Trial in a way that made this court take pause. In the First Trial, Sicking represented that he had "no knowledge" as to whether Legacy had assets sufficient to satisfy an M&M lien filed by

Quasar on the Ragin Cajun 3 well.[55] He further testified that he did not "know anything about Optimum"[56] (the company accused of stealing the Alleged Debtor's business in the Trade Secrets Litigation) and, in the filing of the Involuntary Petition, he didn't "look to recover any money" but rather wanted the "satisfaction that…a good operator, a legitimate operator [would] get a hold of the property.[57]

50.     However, when testifying in the Second Trial, Sicking testified that he agreed to participate in this Involuntary Petition because he was "trying to get paid on this deal" and "recoup some money"[58] though, as stated, he had previously testified that he was not looking to recover any money and had no knowledge as to whether Legacy even had sufficient assets to satisfy the lien held by Quasar.

51.     The court finds this inconsistency in Sicking's testimony troubling, but not dispositive of bad faith. Ultimately, the court finds that there is not sufficient evidence in the record to rebut the presumption of good faith awarded to Sicking. Sicking testified that he was motivated to participate in this involuntary case because "Delfin [had] been a customer of [Quasar's] that actually pays their bills" and Sicking did not see what he had to lose by "going with them."[59] Sicking explicitly testified that he intended to "help [Delfin] out the best [he] could,"[60] and he joined the involuntary because Delfin and Rather asked him.[61] Sicking also testified under penalty of perjury that he did not join the Involuntary Petition out of any ill will, malice, or desire to harass or harm Legacy.[62] While the court believes Sicking might have been largely motivated here by the

---

[55] First Tr. DE # 71, 201: 23-25, February 24, 2026.
[56] First Tr. DE # 71, 206: 22-23, February 24, 2026.
[57] First Tr. DE # 71, 203: 9-12, February 24, 2026.
[58] Second Tr. DE #128, 34: 5-8, June 10, 2026.
[59] First Tr. DE # 71, 203: 3-4, February 24, 2026.
[60] First Tr. DE # 71, 211: 18-20, February 24, 2026.
[61] First Tr. DE # 71, 211: 21-23, February 24, 2026.
[62] Second Tr. DE #128, 37: 13-16, June 10, 2026.

want to stay on good terms with Ralph Rather, the court does not believe Sicking was motivated by ill will, malice, or for the purpose of embarrassing or harassing Legacy. While this court does not think Sicking's motives were entirely pure, given the totality of the circumstances, they do not rise to the level of bad faith.

52.     Sicking testified repeatedly across both the First Trial and the Second Trial that he joined the Involuntary Petition with at least some intention of getting back any possible money from Legacy that would have been available. The additional fact that Sicking might have been motivated by the want to support a business contact, here Rather, is not in itself sufficient to indicate that Sicking had wrongful motive or objective. The want to support a business relationship does not in and of itself imply a want to harm someone else.

53.     While Sicking's motivation may have been partially inappropriate, there is not sufficient evidence to show ill will, malice, or desire to embarrass or cause harm to the Alleged Debtor. There is also no evidence that Sicking acted to obtain any kind of disproportionate advantage. While aligning with Rather might result in increased bargaining power, there is insufficient evidence to show that this was Sicking's sole or primary intention. If anything, Sicking's testimony indicated some desire to work with Rather going forward rather than Legacy.

54.     In *In re Synergistic Techs., Inc.,* this court looked at the totality of the circumstances to determine if there was bad faith on the part of the petitioning creditor.[63] Specifically, the court looked at the fact that the bankruptcy case was filed in the middle of litigation and arbitration that had been pending for a long time.[64] That, combined with the fact that the litigation was teed up for resolution, made the filing of the involuntary petition seem like forum shopping.[65]

---

[63] *In re Synergistic Techs., Inc., 2007 Bankr. LEXIS 2660.*
[64] *Id.* at *19.
[65] *Id.* at *19-20.

55.     That case specifically featured a bankruptcy filing with no motive of salvaging an enterprise, nor salvaging any valuable asset, nor gaining a needed respite so that perhaps a plan might be formulated to deal with debt.[66] *In re Synergistic Techs., Inc.,* was not a situation where bankruptcy was filed to save an enterprise; to save valuable assets; or to accomplish orderly liquidation, it was a shareholder dispute that was diverted to another forum.[67]

56.     In that case, this court found no bad faith due to the good faith presumption, and the credible testimony of the creditor that his motivation was to bring in a third party to help sort out the estate's assets and help end the ongoing litigation because he was running out of money and believed that filing bankruptcy was an appropriate solution.[68] While the petitioning creditor's actions in that case were inappropriate, he did not have ill will, malice, to desire to embarrass or cause harm to the alleged debtor and did not file the involuntary to obtain a disproportionate advantage, but rather to wind things down.

57.     Though this court believes Sicking may have had less than pure motivation in the filing of this Involuntary Petition, the totality of the circumstances does not raise his involvement to the level of bad faith.

C.  Trojan

58.     This court finds that Trojan did, indeed, act in bad faith with ill will, malice, and the desire to embarrass or cause harm to Legacy in the filing of this Involuntary Petition. As discussed in the First Opinion, Trojan is an affiliate of Optimum, that is, in turn, owned in significant part by Chance Smith,[69] who worked[70] at Legacy until March 2021 before leaving and

---

[66] *Id.* at *21.
[67] *Id.*
[68] *Id.* at *22.
[69] Smith testified at the first trial that he was a 31% owner of Trojan and was the Chief Operating Officer of Optimum with a 19%-27% ownership interest.
[70] Either as an employee or an independent contractor for services

founding Optimuim that same month. Both Optimum and Smith are defendants in the above-described Trade Secrets Litigation in which they are represented by attorneys Nelson Mullins and attorney Buyse, the same law firm and lawyer representing the Petitioning Creditors in this case. Smith is also a plaintiff in the RICO Lawsuit, in which he is again represented by Nelson Mullins and Buyse. Trojan and Smith are also defendants in the Tortious Interference Litigation alongside Optimum. Optimum's relationship with Trojan is further emphasized by Smith's testimony that Optimum paid the first invoice for Trojan's attorneys' fees in relation to this Involuntary Petition.[71]

59.      On March 20, 2024, three weeks prior to the anticipated start of the trial in the Trade Secrets Litigation, Trojan purchased the Trager Judgment for $500,000, an amount that was funded by Optimum via a loan to Trojan.[72] For the sake of clarity, the court emphasizes that this was an unusual act for Trojan, as established by Smith's testimony that Trojan had never purchased another piece of distressed debt prior to purchasing the Trager judgment.[73] Smith testified on behalf of Trojan at the First Trial, during which time he testified that Trojan had been motivated to purchase the Trager Judgment for $500,000 to give Trojan leverage in collecting on a mere $41,427.44 trade debt that Legacy owed to it.[74] The court found Smith's testimony to be utterly incredulous on this point.  Trojan's purchase of the Trager Judgment was not just an unusual act for Trojan to take, but it appeared to be a tactic by Trojan to put pressure on Legacy and thwart Legacy's efforts in the Trade Secrets Litigation—a tactic that was riddled with conflicts of interest. How so? Smith testified that Trojan wanted to collect on the Trager Judgment as soon as possible, yet, at the same time, he did not want Legacy to pursue the Trade Secrets Litigation (in which Smith was a defendant) –and this litigation would be the most likely avenue for Legacy to pay its

---

[71] First Tr. DE # 71, 172: 1-5, February 24, 2026.
[72] First Tr. DE # 71, 168:20-169:15, February 24, 2026.
[73] First Tr. DE # 71, 166: 22-25, February 24, 2026.
[74] First Tr. DE # 71, 170:22-25-171:1-12, February 24, 2026.

creditors, including the holder of the Trager Judgment.[75]

60. To be clear, Trojan's motives in choosing to be a Petitioning Creditor seem highly suspect (to put it mildly). Trojan's 31% owner (Smith) has been a defendant in a lawsuit with Legacy (i.e., the Trade Secrets Litigation) since 2022. Smith is accused, along with others, of ***stealing Legacy's business secrets and opportunities***. Trojan purchased the Trager Judgment in what appears to have been an effort to shut down (through a turnover motion) Legacy's Trade Secrets Litigation. The court notes that the acquisition of the Trager Judgment by Trojan does not, ***in and of itself***, appear to disqualify Trojan from being a Petitioning Creditor, pursuant to Bankruptcy Rule 1003(a) because of the timeline here—Trojan purchased the Trager Judgment more than a year-and-a-half before the Involuntary Petition was filed. Thus, it does not appear to be the case that Trojan purchased the Trager Judgment "for the purpose of commencing an involuntary," as contemplated by Bankruptcy Rule 1003(a).

61. Yet Trojan has an extensive history with Legacy and is highly involved in many of the ongoing litigations. Its principal, Smith, testified in a way that seemed incredible at times. These facts, coupled with Trojan's affiliation with Optimum (i.e., the company that was formed by Smith and other employees who left Legacy), and Trojan's purchase of the Trager Judgment, leads this court to believe that Trojan has acted in bad faith in the filing of the Involuntary Petition. This court does not find Smith's testimony believable that Trojan agreed to participate in filing the Involuntary Petition because they wanted the money they were owed by Legacy.[76] This reasoning runs in direct opposition to Trojan's actions in the numerous ongoing litigations in which they are involved relating to Legacy. Trojan asserts it wants to be paid what it is owed, but at the same time has a motivation to ensure Legacy does not prevail in the ongoing litigations, which, at present,

---

[75] First Tr. DE # 71, 182: 5-11, February 24, 2026.
[76] First Tr. DE # 71, 161: 17-20, February 24, 2026.

appear to be Legacy's best chance at gaining funds to pay back its creditors. The court finds that Trojan has acted with wrongful motive and objective and, in looking at the totality of the circumstances, finds that Trojan has acted with ill will, and with intentions of harassing Legacy.

D.  Determining the Amount of Punitive Damages

62.     Upon a finding of bad faith under section 303(i)(2), Legacy requested that the court award punitive damages measured as a multiple of the attorneys' fees, in the range of four to five times the fees. Legacy also asked the court to award, or to require security for, the fees Legacy expects to incur in the pending appeal. Legacy represented that its total fees were approximately $216,144.25, to date. Legacy therefore requests that this court award damages in an amount somewhere between $860,952 and $1,076,190.

63.     The Petitioning Creditors did not challenge the hourly rates of the Alleged Debtor's two law firms (Hayward PLLC and Law Offices of Gregory K. Evans). Should the court award fees, however, the Petitioning Creditors asked the court to examine the invoices for block billing, for vague entries describing "strategy," and for time devoted to a separate Rule 9011 sanctions motion against the law firm of Nelson Mullins, and the Petitioning Creditors contended that the cost of that sanctions motion should not fall on the Petitioning Creditors.

64.     While the Petitioning Creditors asked the court to examine the invoices for the above allegedly concerning entries, the Petitioning Creditors failed to point out to the court the exact entries they considered problematic, despite being given the chance. Therefore, with no entries being noticeably problematic to the court, the court will not delve into this issue any further.

65.     Punitive damages go beyond merely compensating the party injured by malicious or bad faith conduct and are intended to punish the wrongdoer and to deter future misconduct.[77]

---

[77] *See generally BMW of North America, Inc. v. Gore,* 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996).

27

Typically, the amount of a punitive damages award must bear some relationship to and be proportionate to the amount of compensatory damages awarded.[78]

66.     This court finds that an award of punitive damages is appropriate with regard to Trojan due to the finding of bad faith. The court further finds that punitive damages are appropriate to deter Trojan from engaging in such actions in the future and, instead, to encourage use of proper channels and methods to resolve issues such as this.

67.     As established, Legacy's counsel presented approximately $216,144.25 in legal fees and costs they had accrued in relation to this case, which the court determines was reasonable here. Awarding punitive damages in this situation is not an exact science.  Under all the facts and circumstances, this court will award $100,000 in punitive damages to be paid to Legacy by Trojan. This number is 46% of the legal fees and costs accrued in this case, which the court determines to be appropriate under the circumstances.

## VI.     Conclusion.

For the reasons set forth above, the court concludes, in its discretion, that all 24 Petitioning Creditors should be held jointly and severally liable to Legacy for attorneys' fees and costs under section 303(i)(1). The court further concludes that the evidence only established that Trojan acted with the requisite bad faith under section 303(i)(2), and it is solely liable for punitive damages. Accordingly,

**IT IS ORDERED, ADJUDGED, AND DECREED** that all 24 Petitioning Creditors are jointly and severally liable to Legacy for its reasonable attorneys' fees and costs incurred in

---

[78] *See generally State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 426, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003).

28

connection with the Involuntary Petition, under section 303(i)(1), in the amount of **$216,144.25,** with those Petitioning Creditors being the following:

Trojan Tubular Services, LLC; Quasar Energy Services, Inc.; Duncan Oilfield Construction & Equipment Sales, Inc.; Byrd Oilfield Services, LLC; Freda Sparkman Family Trust; Sally Marshall; Nancy Bagoly; Virginia Newton; George Sparkman; Monica Alexander; Betty J. Sparkman; Cynthia Johns; Angela Steagall; Warren Coody; Ruth Coody; Phil Allen; Cary Battishill; Aaron Dahl; Michael Dilick; Rodney Eaton; Nam Ko; Kareny Kyman; Jay Mckinney; and Deryl Peoples.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Trojan Tubular Services, LLC, separately and solely, is liable to Legacy for additional punitive damages under section 303(i)(2), in the amount of **$100,000.00**.

All amounts awarded herein shall accrue interest at the Federal Judgment Rate in effect as of the date of entry of this Judgment.

All further relief is denied, except nothing in this Judgment is meant to dispose in any way of the issues and claims pending in the Rule 11 Sanctions motion that is being pursued by Legacy against Nelson Mullins and Brent Buyse.

### END OF MEMORANDUM OPINION AND JUDGMENT ###